HARBOR FINANCE PARTNERS, a
Colorado Limited Partnership,
Plaintiff,

v.

H. Wayne HUIZENGA, Michael G. De-
Groote, Harris W. Hudson, J.P. Bryan,
Rick L. Burdick, George D. Johnson,
Jr., John J. Melk and Republic Indus-
tries, Inc., Defendants.

Civil Action No. 14933.

Court of Chancery of Delaware,
New Castle County.

Submitted: Oct. 27, 1999.
Decided: Nov. 17, 1999.

Joseph A. Rosenthal, of Rosenthal, Monhait, Gross & Goddess, Wilmington, Delaware; Jeffrey M. Haber, of Weschsler Harwood Halebian & Feffer, New York City, for Plaintiffs, of counsel.

Thomas J. Allingham II, Robert S. Saunders, Kevin M. Maloy, Stephen D. Dargitz, of Skadden, Arps, Slate, Meagher & Flom, Wilmington, Delaware, for Defendants.

## OPINION

STRINE, Vice Chancellor.

This matter involves a challenge to the acquisition of AutoNation, Incorporated by Republic Industries, Inc. A shareholder plaintiff contends that this acquisition (the "Merger") was a self-interested transaction effected for the benefit of Republic directors who owned a substantial block of AutoNation shares, that the terms of the transaction were unfair to Republic and its public stockholders, and that stockholder approval of the transaction was procured through a materially misleading proxy statement (the "Proxy Statement").

The defendant directors of Republic seek to dismiss the complaint because: the plaintiff failed to make a demand on the Republic Board and as such the derivative unfairness claim in the complaint should be dismissed pursuant to Chancery Court Rule 23.1; the complaint fails to state a claim that the Merger was unfair to Republic or its stockholders; and the complaint fails to state a claim that the Proxy Statement was materially misleading.

In this opinion, I resolve these issues as follows:

*The Rule 23.1 motion:* Three of the seven Republic directors are concededly disabled from impartially considering a demand and the issue of demand excusal turns on the status of a fourth director, defendant Harris V. Hudson. Because Hudson was a stockholder in AutoNation, has significant business relationships with AutoNation's largest stockholder, defendant H. Wayne Huizenga, and is Huizenga's brother-in-law, plaintiff has pled facts demonstrating Hudson's inability to objectively consider a demand that the Republic board sue the proponents of the Merger. *See* § II(A), *infra.* Demand is therefore excused and the defendants' motion to dismiss under Chancery Court Rule 23.1 is denied.

*The Rule 12(b)(6) motion:* The complaint fails to state a claim that the disclosures in connection with the Merger were misleading or incomplete. *See* § II(B)(5), *infra.* The affirmative stockholder vote on the Merger was informed and uncoerced, and disinterested shares constituted the overwhelming proportion of the Republic electorate. As a result, the business judgment rule standard of review is invoked and the Merger may only be attacked as wasteful. As a matter of logic and sound policy, one might think that a fair vote of disinterested stockholders in support of the transaction would dispose of the case altogether because a waste claim must be supported by facts demonstrating that "no person of ordinary sound business judgment" could consider the merger fair to Republic[1] and because many disinterested and presumably rational Republic stock-

---

1. *See, e.g., Saxe v. Brady,* Del.Ch., 184 A.2d 602, 610 (1962).

holders voted for the Merger. *See* § II(B)(4), *infra.* But under an unbroken line of authority dating from early in this century, a non-unanimous, although overwhelming, free and fair vote of disinterested stockholders does not extinguish a claim for waste.[2] *See* § II(B)(4), *infra.* The waste vestige does not aid the plaintiff here, however, because the complaint at best alleges that the Merger was unfair, *see* § II(B)(2), *infra,* and does not plead facts demonstrating that no reasonable person of ordinary business judgment could believe the transaction advisable for Republic. *See* § II(B)(3), *infra.* Thus I grant the defendants' motion to dismiss under Chancery Court Rule 12(b)(6).

## I. *Factual Background*

The following facts are for the most part drawn exclusively from the amended complaint.[3] Some are also drawn from the Proxy Statement, which was expressly referenced and quoted in the complaint.

## A. *The Defendants*

Nominal defendant Republic operates several business lines, including a solid waste disposal, collection, and recycling business. In 1996, Republic expanded into the automobile rental and retailing business.

The other defendants are all members of the board of directors of Republic (the "Board"). Four of the directors were AutoNation stockholders before the Merger. Three were not.

### 1. *The AutoNation Stockholder Directors*

Defendant Wayne Huizenga has been the Chairman and Chief Executive Officer of Republic since August 1995, when he made a major equity investment in the company. He owns 15% of the outstanding common stock of Republic.

Huizenga has had a diverse and successful business career. Huizenga co-founded Waste Management, Inc. in 1971 and served that company in various capacities, including as President and director, until 1984. Huizenga served as Chairman of the Board and CEO of Blockbuster Entertainment Corporation from 1987 until 1994, when that company was sold to Viacom Inc. Huizenga now also owns or controls the Miami Dolphins, the Florida Marlins, the Florida Panthers, and the Pro Player Stadium in Southern Florida. He is Chairman of the Board of Florida Panthers Holding, Inc. ("PUCK") and Extended Stay America, Inc. ("Extended Stay"). In 1996, Huizenga also became the second largest stockholder in Century Business Services, Inc. ("Century").

Before the Merger, Huizenga was AutoNation's largest stockholder. In the Merger he received 6,397,757 Republic shares in exchange for his 29,375,000 AutoNation shares. On the Merger date of January 16, 1997, the Republic shares Huizenga received were worth over $235 million.

Defendant Harris Hudson is a director of Republic and owned 10.1% of the company's shares before the Merger. From August 1995 until October 1996, Hudson served as Republic's President. His involvement in Republic commenced simultaneously with that of Huizenga. Hudson owned 100,000 shares of AutoNation stock before the Merger and received 21,779 Republic shares in that transaction. On the Merger date, the Republic shares Hudson received were worth $825,000. Hudson is Huizenga's brother-in-law. For eighteen years, Hudson served as a Vice President of Waste Management of Florida, Inc., which was Waste Management's predecessor and later one of its subsidiaries. Hudson also serves as a director of PUCK.

Defendant George A. Johnson has served as a director of Republic since No-

---

**2.** *See, e.g., Michelson v. Duncan,* Del.Supr., 407 A.2d 211 (1979).

**3.** Hereinafter referred to solely as the complaint.

vember 1995. In the Merger, Johnson received 544,490 shares of Republic shares for his 2.5 million AutoNation shares. On the Merger date, the Republic shares Johnson received were worth over $20 million. Johnson is Chairman, CEO, and director of Extended Stay. From 1993 until 1995, when Huizenga sold Blockbuster to Viacom, Johnson was a director of Blockbuster and a president of one of Blockbuster's divisions.

Defendant John J. Melk became a director of Republic at the time Huizenga joined the Board. In the Merger, Melk received 179,681 Republic shares for his 825,000 shares of AutoNation stock. On the Merger date, the Republic shares Melk received were worth over $6.6 million. Melk held various management positions at Waste Management while Huizenga controlled that company. Before Huizenga sold Blockbuster, Melk was a member of that company's board. As of December 1996, he was a director of Extended Stay.

### 2. The Republic Directors Who Did Not Own AutoNation Shares

Defendant Michael G. DeGroote is a director and the largest single stockholder in Republic, owning 15.1% of Republic's shares before the Merger. Before August 1995, DeGroote was Republic's CEO. DeGroote is CEO of Century and its largest stockholder. DeGroote has served as a director of Gulf Canada Resources Ltd. ("Gulf Canada") since May of 1995.

Defendant J.L. Bryan is a director of Republic and President and CEO of Gulf Canada.

Defendant Rick L. Burdick has been a director of Republic since May 1991. Burdick has an equity interest in the law firm of Akin, Gump, Strauss, Hauer & Feld ("Akin Gump"). Akin Gump, through Burdick, performed legal services for Republic in 1996 and 1997 and "received substantial remuneration therefrom."[4] Burdick has also performed legal work on behalf of DeGroote, and *Institutional Investor* magazine has allegedly referred to him as one of the "key members of Huizenga's entourage" of "a small and loyal group of investors."[5]

### 3. The Relationships Among Republic's Directors

As the reader has probably gleaned from the numerous companies mentioned above, the Republic directors' business relationships with one another are not confined to their common association with Republic. Rather, the Republic directors have worked together as fellow directors, managerial colleagues, and shareholders in a variety of business enterprises over the years.

The following chart illustrates the companies in which the directors have simultaneously served as managers, directors, contractors, or shareholders. As to Republic itself, I limit inclusion to those instances where the director was a manager or contractor contemporaneously with the Merger.

---

4. Compl. ¶ 15 a.

5. *Id.* ¶ 15 c.

| | Auto Nation | Block-buster | Century | Extended Stay | Gulf Canada | PUCK | Republic (current officer or service provider only) | Waste Management |
|---|---|---|---|---|---|---|---|---|
| Huizenga | ✓ | ✓ | ✓ | ✓ | | ✓ | ✓ | ✓ |
| Hudson | ✓ | | | | | ✓ | | ✓ |
| Johnson | ✓ | ✓ | | ✓ | | | | |
| Melk | ✓ | ✓ | | ✓ | | | | ✓ |
| DeGroote | | | ✓ | | ✓ | | | |
| Bryan | | | | | ✓ | | | |
| Burdick | | | ✓ | | | | ✓ | |

## B. *The Merger*

AutoNation was formed in the second half of 1995. AutoNation's business plan contemplated the development of a chain of used car "megastores" that would operate under the brand name "AutoNation USA."[6]

Several Republic directors helped form AutoNation. Huizenga and members of his family initially held 55% of AutoNation's stock; this was reduced to 37.4% through subsequent transfers. As noted, Directors Johnson, Melk, and Hudson also bought substantial blocks of AutoNation shares.

Before AutoNation opened a single store, it embarked on merger discussions with Republic. In mid-March of 1996, Huizenga told DeGroote that AutoNation had retained Merrill Lynch, Pierce, Fenner & Smith, Incorporated ("Merrill Lynch") and other investment advisors to assist AutoNation in considering an initial public offering. In these discussions, Huizenga said that these advisors had given oral advice that the preliminary valuation of AutoNation for purposes of an IPO was around $1 billion. Yet Merrill Lynch's contemporaneous written valuation of AutoNation allegedly contained base case scenarios valuing AutoNation at no more than $300 million.[7]

On March 29, 1996, Republic held a Board meeting. At that meeting, Huizenga proposed that Republic acquire AutoNation for $250 million worth of Republic shares. The Board agreed to the proposal and Republic issued a press release later that day announcing that it intended to purchase AutoNation on those terms. This amounted to 17,467,248 Republic shares or 0.217796 Republic shares for every AutoNation share (the "Exchange Ratio"), based on the trading price of Republic shares at the close of the market on March 26, 1996.[8]

The Board formed a special committee (the "Special Committee") to consider the acquisition proposal. Bryan, Burdick, and DeGroote were appointed. DeGroote was selected to be the Chairman.

The Special Committee undertook to hire an independent investment advisor to assist it in reviewing the acquisition proposal. Rejecting proposals from other prestigious investment banking firms, the Special Committee retained Merrill Lynch. It did so despite Merrill Lynch's forthright disclosure of its relationship with AutoNation and the fact that Merrill Lynch had already " 'built a substantial valuation model of AutoNation's history, operations

---

**6.** Compl. ¶ 2.

**7.** The Proxy Statement indicates that Merrill Lynch's later discounted cash flow analysis produced values for AutoNation's equity of $600 million to $1 billion under a "conservative case" scenario and values of $2 to $2.6 billion under an "aggressive case" scenario. Proxy Statement (hereinafter "P.S.") at 21.

**8.** The number of shares and exchange ratio at that time were actually half what is referenced above. Republic's stock split after the May Board approval of the Merger and that accounts for the difference. I use the final Exchange Ratio, which is not economically different, for the sake of clarity and simplicity.

and financial prospects' on this very issue for 'certain stockholders of AutoNation.'"[9]

Negotiations between Republic and AutoNation ensued to reach a final merger agreement. These negotiations proceeded without participation by any members of the Special Committee or Merrill Lynch.[10] Richard L. Handley and Gregory K. Fairbanks handled the negotiations for Republic. Handley was Republic's Senior Vice President and General Counsel at the time. Fairbanks was Executive Vice President and Chief Financial Officer of Republic. As such, both Handley and Fairbanks were management subordinates of Republic's CEO, Huizenga, at the time of the negotiations. The negotiations did not produce a change in the Exchange Ratio.[11]

On May 7, 1996, Merrill Lynch delivered a written opinion to the Special Committee indicating that the Exchange Ratio was fair to Republic's stockholders from a financial point of view. The next day the Special Committee approved the Merger and the full Board met thereafter and approved the Merger Agreement. The Merger was contingent on approval by the stockholders of Republic.

In connection with the Merger Agreement, Republic and AutoNation also entered into a loan agreement (the "Loan Agreement"). The Loan Agreement required Republic to provide AutoNation with a line of credit to fund AutoNation's cash flow requirements before consummation of the Merger.

The Board's approval of the Merger Agreement was publicly disclosed the same day. The press release disclosed the Exchange Ratio but did not mention the Loan Agreement.

On December 16, 1996, Republic sent its stockholders the Proxy Statement in connection with the Merger vote. By this time, the implied merger consideration to be provided to AutoNation stockholders had risen to $558 million because of a sharp increase in the value of Republic's stock price.

By December 31, 1996, AutoNation had also drawn down $247.5 million under the Loan Agreement. The Proxy Statement disclosed that Republic had advanced $112.9 million to AutoNation as of September 30, 1996 but did not disclose the specific amounts of any subsequent advances.

On January 16, 1997, the Republic shareholders overwhelmingly voted to approve the Merger. Although the complaint does not mention this fact, the Proxy Statement indicates that the Republic directors who owned AutoNation shares controlled no more than 27% of the votes.[12]

According to the plaintiff, the AutoNation concept resulted in a $150 million restructuring charge a year after the Merger. The charge reflected the cost of merging Republic's AutoNation used car business with its new car franchise operations. At the same time, Republic announced that it would no longer report

---

9. Compl. ¶ 27.

10. For fairness' sake, I note that the Proxy Statement describes negotiations that include the direct participation of members of the Special Committee. P.S. at 17. The plaintiff does not allege that this description is false.

11. According to the Proxy Statement, the negotiations did result in an agreement by several of the largest stockholders of AutoNation, including Huizenga, to hold their Republic shares for at least two years after the Merger. "The Special Committee believed such lockup agreements to be important as they would preclude the investors in AutoNation, includ-

ing Mr. Huizenga, from being able to realize any financial gain from the shares of Republic Common Stock received in the Merger until a point in time when the financial performance of AutoNation as a division of Republic would be contributing to the earnings and growth of Republic. Alternatively, if AutoNation were to fail to meet expectations, the shareholders of AutoNation, including Mr. Huizenga, would not be able to profit from the merger transaction before the results of AutoNation were established and presumably reflected in the market price of Republic Common Stock." P.S. at 18.

12. P.S. at 41–42.

business information regarding its used car business separately from its new car business. For these reasons, the plaintiff contends that "Republic buried its used-car tracks under its new-car business ... to conceal the ill-conceived nature and poor results of its used-car AutoNation acquisition...."[13]

## II. *Legal Analysis*

The defendants argue that the complaint should be dismissed for two major reasons. First, the defendants contend that Count I of the complaint, which challenges the Merger's fairness to Republic, should be dismissed pursuant to Chancery Court Rule 23.1 because the plaintiff failed to make a demand on the Republic Board. Second, the defendants contend that Counts I and II fail to state a claim upon which relief can be granted.

For the sake of creating a completely reviewable record, I deal with each of these arguments in turn.

### A. *Defendants' Rule 23.1 Motion: Was Demand On The Republic Board Required?*

■ Chancery Court Rule 23.1 requires a plaintiff prosecuting a derivative action to "allege with particularity ... the reasons ... for not making" a demand on the board of directors.[14] In considering a motion to dismiss under Rule 23.1, the court must accept the well-pleaded allegations of the amended complaint as true.[15] Conclusory allegations, however, will not be accepted as true.[16]

■ To determine whether demand is excused, I must apply the familiar test set forth by the Supreme Court in *Aronson v. Lewis*.[17] That test requires an evaluation of whether, under the particularized facts alleged in the complaint, a reasonable

doubt is created that either a majority of "the directors are disinterested and independent" or that the "challenged transaction was otherwise the product of a valid exercise of business judgment."[18]

In this case, the plaintiff alleges that demand is excused under the first prong of *Aronson* because a majority of the Board members are directly interested in the Merger and/or beholden to Huizenga. For their part, the defendants concede that defendants Huizenga, Johnson, and Melk held so many AutoNation shares before the Merger as to render them incapable of objectively considering a demand. They argue that the remaining four members of the Republic Board have no disabling characteristics and can independently and impartially determine whether to bring suit to rescind the Merger or recover damages resulting from that transaction. As a result, if the amended complaint gives me reason to doubt the impartiality of any one of the remaining directors, demand is excused.

■ Plaintiff and defendants do battle mostly over the status of director Hudson. Plaintiff contends that director Hudson's objectivity is in grave doubt because of his familial and business relationships with Huizenga, as well as the fact that Hudson owned AutoNation shares before the Merger.

The defendants contend that Hudson is not so beholden to Huizenga as to make it doubtful that Hudson can impartially consider whether to cause Republic to sue to rescind a merger in which Huizenga received $235 million worth of Republic stock. They note that Delaware courts have often adjudicated business disputes involving fights among family members and that I cannot presume that Hudson

---

13. Compl. ¶ 47.

14. Ch. Ct. Rule 23.1.

15. *Grobow v. Perot,* Del.Supr., 539 A.2d 180, 186 (1988).

16. *Id.* at 187; *see also Rales v. Blasband,* Del.Supr., 634 A.2d 927, 931 (1993).

17. Del.Supr., 473 A.2d 805 (1984).

18. *Id.* at 814–15.

has a cordial familial relationship with his brother-in-law. They also argue that irrespective of Hudson's direct interest in the Merger as an owner of AutoNation stock, he can be impartial because he owned a much more substantial block of Republic stock before the Merger that rendered his AutoNation holdings immaterial to him.

For several reasons, I harbor a reasonable doubt about Hudson's ability to impartially consider a demand. First, I would be hesitant to conclude that a director whose interest in a transaction clearly implicates the literal terms of 8 *Del. C.* § 144 can disinterestedly evaluate whether the corporation should sue to rescind that transaction.[19] Even if there were some *de minimis* exception to § 144 for insubstantial holdings, such an exception would not seem to apply in Hudson's case.[20] Hudson owned 100,000 shares of AutoNation stock for which he received $825,000 in Republic shares (as of January 16, 1996) in the Merger. This level of investment appears to satisfy § 144.

As a pleading matter, it also seems to meet the materiality standard articulated in the Supreme Court's opinions in *Cinerama, Inc. v. Technicolor, Inc.*[21] and *Cede & Co. v. Technicolor, Inc.* (*"Cede II"*)[22]—a standard that is inapplicable when a director's interest implicates § 144.[23] On this motion, it would seem reasonable to infer that a reasonable Republic director would have regarded the fact that Hudson had nearly a million dollars riding on the Merger " 'as a significant fact in the evaluation of the proposed transaction.' "[24] And at this pleading stage, it would be difficult for me to infer other than that Hudson desired to receive the highest price possible for his AutoNation shares.[25] Likewise, it would be hard to conceive how he could neutrally determine whether Republic should sue him and the other AutoNation stockholder directors to obtain disgorgement of the Republic shares they received in the Merger.

It may well be that economic evidence might ultimately persuade me that it would have been irrational for Hudson to seek unfair economic advantage in the Merger for AutoNation stockholders at the expense of Republic, because any such ad-

**19.** *Aronson*, 473 A.2d at 812 & 815 (*citing* 8 *Del. C.* § 144(a)(1) and stating that where a majority of directors "appear on both sides of a transaction" ... "futility of demand has been established by any objective or subjective standard.").

**20.** There is analytic force to the argument that § 144 should, like many statutes, be read as incorporating a "materiality" element. Such an element would ensure that a director who, for example, owns one share of stock worth $100 or even $1,000, in another entity with which the corporation of which he is a fiduciary is transacting business is not considered "interested." But where a director's interest which triggers the literal language of § 144 is worth, as Hudson's was, several hundred thousand dollars, any statutory materiality element would be easily satisfied. The incorporation of a materiality element into § 144 as a matter of statutory interpretation should not, however, be confused with the "materiality" test articulated in *Cede II* and *Cinerama* to determine whether directors are "interested" in a transaction to which § 144 does not apply. *Cinerama, Inc. v. Technicolor, Inc.*, Del.Supr., 663 A.2d 1156 (1995); *Cede & Co. v. Technicolor, Inc.*, Del.Supr., 634

A.2d 345 (1993) (*"Cede II"*); *see also HMG/Courtland Properties, Inc. v. Gray*, Del. Ch., 749 A.2d 94, 112–14, 1999 Del. Ch. LEXIS 149, at *54–61, Strine, V.C. (1999) (explaining that the *Cede II* and *Cinerama* materiality test applies when § 144 is inapplicable and not when a director is deemed interested by virtue of 8 *Del. C.* § 144).

**21.** 663 A.2d at 1168.

**22.** 634 A.2d at 362–64.

**23.** *HMG/Courtland Properties, Inc. v. Gray*, at 113–14, 1999 Del. Ch. LEXIS 149, at *59–60.

**24.** *Cinerama*, 663 A.2d at 1168 (*quoting Cinerama, Inc. v. Technicolor, Inc.*, Del.Ch., 663 A.2d 1134, 1153 (1994)).

**25.** *Chaffin v. GNI Group*, Del.Ch., C.A. No. 16211, mem. op. at 13, 1999 WL 721569 at *5, 1999 Del. Ch. LEXIS 182, at *15, Jacobs, V.C. (Sept. 3, 1999) ("a director who stands to receive a substantial benefit in a transaction he votes to approve, cannot objectively be viewed as disinterested").

vantage would cause more than. offsetting harm to him, given his 10% ownership interest in AutoNation. I also recognize that the particularized pleading requirement of Rule 23.1 places special burdens on derivative plaintiffs.

■ But I would be disinclined to find that a derivative plaintiff has the obligation at the pleading stage to demonstrate that a director's material holdings on the other side of the table from the corporation are not outweighed by his stockholdings in the corporation itself. In *Siegman v. Tri–Star Pictures, Inc.*,[26] Vice Chancellor Jacobs refused to analyze whether the holdings of certain Tri–Star Pictures directors · in Coca–Cola were insignificant in view of their allegedly more substantial holdings in Tri–Star. Because the directors' Coca–Cola holdings resulted in their receipt of benefits from the challenged transaction ·not available to all Tri–Star stockholders, a reasonable doubt was created for demand excusal purposes. In so holding, Vice Chancellor Jacobs distinguished between the burden a plaintiff bears to plead reasonable doubt as to director disinterest under Rule 23.1 and its ultimate burden to demonstrate. director interest later in the litigation through admissible evidence.[27]

*Siegman's* refusal to engage in the weighing analysis advocated by the defendants strikes me as quite sensible.[28] But I

---

**26.** Del.Ch., C.A. No. 9477, mem. op. at 32, 1989 WL 48746, at *11, 1989 Del. Ch. LEXIS 56, at *37–38, Jacobs, V.C. (May 5, 1989, rev. May 30, 1989).

**27.** *Id.* at *10, 1989 Del. Ch. LEXIS 56, at 32–33.

**28.** The type of weighing analysis that defendants commend to me may be relevant in situations where directors address a transaction that has different effects on two classes of the corporation's own stock. In those situations, the directors often own both classes of stock because corporations want to align the ·directors' interests with those of all the company's stockholders. Our case law has long recognized that necessity requires directorial action in these circumstances and that such ownership interests do not necessarily strip directors of their disinterested status. *Gilbert v. El Paso Co.*, Del.Supr., 575 A.2d 1131, 1147–48 (1990); *Solomon v. Armstrong*, Del. Ch., 747 A.2d 1098, 1117–18, 1124, 1999 Del. Ch. LEXIS 62, at *44,*65, Chandler, C. (1999); *Jedwab v. MGM Grand Hotels, Inc.*, Del. Ch., 509 A.2d 584, 595 (1986); *Freedman v. Restaurant Assocs. Indus.*, Del.Ch., C.A. No. 9212, mem. op. at 27–28, 1987 WL 14323, at *10, 1987 Del. Ch. LEXIS 498, at *28 (Oct. 16, 1987). .Such transactions do not implicate 8 *Del. C.* § 144.

In evaluating whether to accord business judgment rule protection to a decision of the General Motors board in that context, I recently weighed whether the members of the General Motors board owned so much more of one class of GM's stock than the other as to render it improbable that they could evaluate the transaction impartially. *In re General Motors Class H Shareholders Litig.*, Del.Ch., 734 A.2d 611, 617–18 (1999); *see also In re*

*FLS Holdings, Inc. Shareholders Litig.*, Del. Ch., Cons.C.A. No. 12623, mem. op. at 8–10, 1993 WL 134087, at *5, 1993 Del. Ch. LEXIS 57, at *13–15, Allen, C. (Apr. 21, 1993) (conducting a similar weighing analysis). I engaged in the weighing analysis rather than assume that the necessity of decisionmaking in such circumstances renders it proper for the court to blind itself totally to the directors' economic motivations. Such an analysis was beneficial to the stockholders in that case because it recognized that a board's personal economic circumstances might make it impossible for them to act as an impartial broker between classes of the corporation's stockholders in a zero-sum transaction. Use of the weighing analysis in such cases encourages directors to avoid acting unilaterally in situations where their disinterestedness might be reasonably questioned and to employ procedural protections such as class-specific votes or special committees to ensure fairness.

Putting aside the large issue of whether the statute permits such balancing, the extension of that type of weighing analysis to director interests in other corporations that trigger § 144 would have the opposite effect. Such an extension would encourage directors to eschew procedural protections for the public stockholders in the hope that a court will later find that the directors' conflicting interests in other businesses were outweighed by their stockholdings in the company of which they were fiduciaries. Nor would it make sense to engage in such a weighing exercise exclusively in the demand excusal context. That would set up one standard of interestedness for business judgment rule purposes and another for Rule 23.1 purposes. It is difficult to conceive of the utility of such a bifurcated

need not and do not hinge my decision solely on Hudson's AutoNation holdings, because those holdings are only one of several factors justifying demand excusal as to him.

Hudson's relationship with Huizenga is the most important reason I doubt Hudson's ability to consider a demand impartially. Granting demand in this case would be materially adverse to Huizenga's personal interests, because it could result in Republic pressing for him to return stock worth nearly $235 million and to pay damages on top of that amount. Such a decision would have "potentially significant financial consequences," even for a man of Huizenga's wealth.[29]

Hudson's ties to Huizenga are such that it is unreasonable to believe that Hudson could objectively consider the approval of such a suit against Huizenga. Hudson's business relationship with Huizenga extends back over 30 years. He was a management subordinate of Huizenga's at Waste Management during many of those years. He bought into Republic at the same time as Huizenga. He helped Huizenga develop the AutoNation concept and start the company.[30] He serves on the board of PUCK, Huizenga's sports holding company. This long-standing pattern of mutually advantageous business relations makes me doubtful that Hudson could impartially consider a demand that Republic file a lawsuit adverse to Huizenga's interests.

That Hudson also happens to be Huizenga's brother-in-law makes me incredulous about Hudson's impartiality. Close familial relationships between directors can create a reasonable doubt as to impartiality.[31] The plaintiff bears no burden to plead facts demonstrating that directors who are closely related have no history of discord or enmity that renders the natural inference of mutual loyalty and affection unreasonable.[32] Even were such a burden to exist, the plaintiff has met it here. Why would Huizenga put Hudson on the PUCK board if they were estranged? Why would they have invested in Republic together? Why would they have worked together to start AutoNation?

I acknowledge that a not insubstantial proportion of people have rather cool relationships with their in-laws. That would not seem to be the case with Hudson and Huizenga. Even if it were, many people swallow their actual views of their in-laws for the sake of their spouses (and for the self-interested reason of avoiding marital strife).

Because plaintiff has pled facts that cause me to harbor a reasonable doubt about Hudson's ability to consider a demand impartially and the defendants admit three other directors cannot impartially evaluate the demand, demand is excused.

### B. The Defendants' Rule 12(b)(6) Motion

In deciding the defendant's motion to dismiss, I will apply the familiar stan-

standard. See Aronson, 473 A.2d at 812 ("the entire question of demand futility is inextricably bound to issues of business judgment and the standards of that doctrine's applicability").

29. Rales, 634 A.2d at 936.

30. P.S. at 15.

31. Grimes v. Donald, 673 A.2d 1207, 1216 (1996) (a "material financial or familial interest" can justify demand excusal); Mizel v. Connelly, Del.Ch., C.A. No. 16638, mem. op. at 9–11, 1999 WL 550369, at *4, 1999 Del.

Ch. LEXIS 157, at *11–12, Strine, V.C. (July 22, 1999) (grandson could not objectively consider demand adverse to interests of his grandfather); see also Chaffin v. GNI Group, Inc., mem. op. at 14, 1999 WL 721569 at *5, 1999 Del. Ch. LEXIS 182, at *17–18 (where approval of transaction benefited the son of a director, the father-director was interested for purposes of business judgment rule analysis).

32. Mizel, mem. op. at 11, 1999 WL 550369 at *4, 1999 Del. Ch. LEXIS 157, at *13. In this regard, one wonders how a plaintiff could use tools such as 8 Del. C. § 220 or public filings to generate such facts.

dard.[33] Because the plaintiff relies upon the Proxy Statement in support of its disclosure claim and that document is necessarily integral to that claim, it is proper for me to consider that document in evaluating whether the complaint states a disclosure claim.[34]

### 1. *The Interrelationship Between The Counts Of The Complaint*

The complaint states two counts. Count I alleges that the defendants breached their duty of loyalty by approving the Merger. The Count contends that the defendants approved the Merger to benefit the AutoNation stockholder directors and that the terms of the Merger were unfair to Republic and its public stockholders. Count II alleges that the Proxy Statement failed fairly to disclose all material facts regarding the Merger and, as a result, "Republic's public shareholders were wrongfully induced to approve the ... Merger...." [35]

In this case, Counts I and II are in an important sense dependent on each other. In § II(B)(5), *infra*, I conclude that Count II fails to state a claim that the Republic stockholders' vote in favor of the Merger was tainted by material misdisclosures. Therefore, Count I must be dismissed as well,[36] because the effect of untainted stockholder approval of the Merger is to invoke the protection of the business judgment rule and to insulate the Merger from all attacks other than on the ground of waste.[37]

Because the parties themselves did not initially address the connection between Counts I and II, they were afforded the opportunity to brief that issue. In its supplemental submissions, the plaintiff conceded that dismissal of Count II would preclude Count I. But even though the complaint does not specifically plead waste, the plaintiff contends that the facts set forth in the complaint adequately support a waste claim. Under the Supreme Court's teaching in *Michelson v. Duncan*, "[s]o long as [a] claimant alleges facts in his description of a series of events from which a gift or waste may reasonably be inferred and makes a specific claim for the relief he hopes to obtain, he need not announce with any greater particularity the precise legal theory he is using." [38] Therefore, I must consider whether the plaintiff's implicit waste claim is adequate-

**33.** *See, e.g., In re Tri–Star Pictures, Inc. Litig.*, Del.Supr., 634 A.2d 319, 326 (1993).

**34.** *In re Santa Fe Pacific Corp. Shareholder Litig.*, Del.Supr., 669 A.2d 59, 69–70 (1995).

**35.** Compl. ¶ 55.

**36.** Although it is defendants' burden to prove that the business judgment rule should attach as a result of the vote (i.e., that they made adequate, non-coercive, and non-misleading disclosures in connection with the vote), I have reviewed the Proxy Statement and have failed to identify any material omission or misleading disclosure not asserted by the plaintiff. As such, it is proper to accord burden-shifting ratification effect to the vote. *Solomon v. Armstrong*, 747 A.2d at 1128–29, 1999 Del. Ch. LEXIS 62, at *81–82. In and of itself, the fact that a defendant has proven that a Proxy Statement's disclosures are adequate to justify a Rule 12(b)(6) dismissal should ordinarily be sufficient to meet that burden. The substantial difficulty of winning such a motion (the plaintiff is given the benefit of every doubt), the illogic of requiring the court and defendants to identify disclosure deficiencies not complained of by experienced plaintiffs' lawyers, and the interests of judicial economy support that conclusion. *See In re General Motors Class H Shareholders Litig.*, 734 A.2d 611, 616–17 and 621–29 (1999) (according ratification effect to stockholder vote after examining and dismissing multiple challenges to a merger proxy statement).

**37.** *Marciano v. Nakash*, Del.Supr., 535 A.2d 400, 405 n. 3 (1987) ("approval by fully-informed ... disinterested stockholders ... permits invocation of the business judgment rule and limits judicial review to issues of gift or waste with the burden of proof upon the party attacking the transaction"); *In re General Motors Class H Shareholders Litig.*, 734 A.2d at 616 (citing cases); *Solomon v. Armstrong*, 747 A.2d at 1113–17, 1999 Del. Ch. LEXIS 62, at * 28–42 (discussing this burden-shifting effect in detail).

**38.** Del.Supr., 407 A.2d at 217.

ly pled. If it is not, then the complaint can be dismissed in its entirety because Count II is deficient.[39]

For the sake of thoroughness, I will first address whether the complaint states claims for breach of loyalty and/or waste, independently of any consideration of the stockholder vote on the Merger. I will then explain why Count II does not, in my view, state a disclosure claim.

### 2. Putting The Stockholder Vote Aside, Does The Complaint State An Unfairness Claim?

 The defendants argue that the plaintiff has failed to allege facts that, if accepted as true, support an inference that the Merger was unfair to Republic and its stockholders. In view of the pleading doubt I must afford the plaintiff on a Rule 12(b)(6) motion, I reach a contrary conclusion.

The complaint alleges that, as of the time of the Republic Board's approval of the Merger Agreement, AutoNation was an unproven start-up company with no active operations and huge capital needs. As of that time, the total investment made by AutoNation's stockholders in the company was around $52 million. Yet Republic agreed to give AutoNation's stockholders Republic stock worth five times that amount and ended up pumping another $250 million into AutoNation before the Merger closed.

A majority of the AutoNation Board held material amounts of AutoNation stock and had an interest triggering 8 Del. C. § 144. Although the Merger price and terms were blessed by a putatively independent special committee, the Special

Committee included DeGroote and Burdick, whose business relationships with Huizenga allegedly extend beyond Republic itself. Most important, it is alleged that the Special Committee did not participate in negotiations over the Merger, but left that to management insiders subordinate to the company's CEO Huizenga—the leading mover on the other side of the deal.

Not only that, the Special Committee hired an investment bank that had been helping Huizenga determine whether to raise capital for AutoNation through an IPO. The natural inference is that Merrill Lynch did its best in that role, within the wide confines of professional valuation techniques, to justify an impressive value for AutoNation on behalf of its client, Huizenga. Merrill Lynch then turned around and began working for a client, the Special Committee, whose role was to avoid over-paying for AutoNation. Thus Merrill Lynch's professional incentives were the opposite of what they had been just months before.[40] Furthermore, plaintiff alleges that Merrill Lynch's advice to the Special Committee was flawed.

The plaintiff has pled facts that suggest that a majority of the Republic Board could not disinterestedly or independently evaluate the Merger. The plaintiff has also pled facts that suggest that the Republic Special Committee did not function with the independence and competence necessary to command any deference.[41] As such, the burden of proof may ultimately fall on the defendants to establish that the transaction was entirely fair to Republic and its stockholders.

---

**39.** *In re General Motors Class H Shareholders Litig.*, 734 A.2d at 616; *Solomon v. Armstrong*, 747 A.2d at 1115–16, 1999 Del. Ch. LEXIS 62, at *36.

**40.** *Kahn v. Tremont*, Del.Supr., 694 A.2d 422, 429 (1997) (the fact that a special committee used advisors who had significant prior dealings with the controlling stockholder with whose ninety percent-owned corporation the

committee was supposed to be negotiating "cast serious doubt on the effectiveness of the Special Committee").

**41.** *Kahn*, 694 A.2d at 428 (special committee does not obviate use of entire fairness standard and burden to prove unfairness is only placed on the plaintiff if the special committee is shown to be "independent" and "well functioning").

The plaintiff has also pled facts suggesting that the defendants may be unable to prove the financial fairness of the Merger.[42] Their sum total convinces me that Count I states a claim, although some of these "facts" are pled at the very outer margins of adequacy.[43]

### 3. Putting The Stockholder Vote Aside, Does The Complaint State A Claim Of Waste?

▮▮▮ The pleading burden on a plaintiff attacking a corporate transaction as wasteful is necessarily higher than that of a plaintiff challenging a transaction as "unfair" as a result of the directors' conflicted loyalties or lack of due care.[44] To plead a claim of waste, the plaintiff must allege facts showing that " 'no person of ordinary sound business judgment' " could view the benefits received in the transaction as " 'a fair exchange' " for the consideration paid by the corporation.[45] Put another way, if, under the facts pled in the complaint, "any reasonable person might conclude that the deal made sense, then the judicial inquiry ends." [46]

▮▮▮ Here, the plaintiff has not pled *facts* that, if true, could support a conclusion that no rational person could regard the Merger as sensible. In determining why that is so, I believe it important to step back and look at the big picture presented by the Merger. By the complaint's own admission, Republic entered the new car retail automobile industry in 1996.[47] Although the complaint does not burden me with what that means, I infer that it means that Republic was developing its own network of new automobile dealerships. At the same time, AutoNation was putting together a network of used car "megastores," and over $50 million had already been invested by its owners in laying the groundwork to bring that concept to market. The proposition that it might make sense for Republic to purchase AutoNation and to develop a network of dealerships that could sell new and used cars seems to me to be one that could well commend itself to a reasonable person of ordinary business judgment.

The complaint does not plead facts to the contrary. In lieu of facts, the plaintiff quotes excerpts from newspaper articles questioning the value of AutoNation's proposed network of used car superstores and indicating that the concept of such superstores is one that has yet to be proved profitable. The president of one of Auto-

---

**42.** In this regard, I give no weight to the increase in value of Republic's shares from May 1996 until the Merger consummation. There is no factual allegation that the Exchange Ratio was fixed with the foreknowledge that Republic's share value would thereafter increase. Indeed, it is much more plausible to infer that the increase in Republic's share price reflected the marketplace's favorable reaction to the Merger. The timing of the increases in Republic's stock prices suggest that when Republic made announcements in support of or consistent with a corporate strategy built around the automobile retailing megastore concept, the market reacted with appreciation. On a motion to dismiss, however, I need only note that no inference of unfairness can be drawn from the increase.

**43.** Cf. *Solomon v. Pathe Communications Corp.*, Del.Ch., C.A. No. 12563, mem. op. at 12, 1995 WL 250374 at *5, 1995 Del. Ch. LEXIS 46, at *14, Allen, C. (Apr. 21, 1995)

("Even in a self-interested transaction in order to state a claim a shareholder must allege some facts that tend to show that the transaction was not fair."), aff'd, 672 A.2d 35 (1996).

**44.** *In re 3COM Corp. Shareholders Litig.*, Del. Ch., C.A. No. 16721, mem. op. at 11, 1999 WL 1009210, Steele, V.C. (Oct. 25, 1999).

**45.** *Michelson v. Duncan*, Del.Supr., 407 A.2d at 224 (quoting *Kaufman v. Shoenberg*, Del. Ch., 91 A.2d 786, 791 (1952)); see also *Saxe v. Brady*, Del.Ch., 184 A.2d 602, 610 (1962); *Solomon v. Armstrong*, 747 A.2d at 1115–16, 1999 Del. Ch. LEXIS 62, at *36 (quoting *In re The Walt Disney Co. Derivative Litig.*, 731 A.2d at 368–69 (1998)).

**46.** *Steiner v. Meyerson*, Del.Ch., C.A No. 13139, mem. op. at 2, 1995 WL 441999 at *1, 1995 Del. Ch. LEXIS 95, at *3, Allen, C. (Jul. 19, 1995).

**47.** Compl. ¶ 10.

Nation's competitors, Drivers Mart Worldwide—an executive who himself was "preparing to open used car superstores in the Fall of 1996" and therefore must have thought the concept worthy of exploration—is quoted as having "laughed" when he was asked whether he could fetch $250 million for Drivers Mart.[48] The complaint alleges no facts indicating that Drivers Mart can be validly compared to AutoNation for valuation purposes. The complaint quotes another of AutoNation's competitors who questioned AutoNation's strategy of planning to open a number of superstores at one time.[49] Furthermore, the complaint confidently tells me that "losses in the used-car industry are the norm, rather than the exception."[50]

■ Although Delaware has a notice pleading standard, that standard does not totally relieve a plaintiff of the burden to plead facts, not conclusions. The complaint does not contain any analysis of AutoNation's actual plans to open the megastores; it simply contains eye-catching snippets of quotes from industry competitors who have obvious motives for downplaying AutoNation's prospects. And its rather amazing statement (in view of the sheer number of such apparently money-losing establishments in this small state alone) that the used-car industry is, on the whole, an unprofitable one is wholly conclusory.

Other than these assertions, the complaint rests largely on: i) the previously discussed facts bearing on the fairness of the negotiations; ii) allegations that Merrill Lynch's fairness opinion was flawed; and iii) the fact that over a year after the Merger Republic took a charge against

earnings to consolidate its new and used car operations. But even the totality of these pleadings do not give rise to a proper waste claim.

The attack on the fairness of the negotiations certainly gives flavor to the plaintiff's claim of waste. But the mere assertion that the transaction implicates 8 *Del. C.* § 144 and that the directors did not conduct the negotiations through a well-functioning special committee cannot, in and of itself, be sufficient to support a waste claim. Rather, the fundamental basis for a waste claim must rest on the pleading of facts that show that the economics of the transaction were so flawed that no disinterested person of right mind and ordinary business judgment could think the transaction beneficial to the corporation.[51] Otherwise, the distinction between a "fairness" claim extinguishable by a stockholder vote and a "waste" claim would be illusory.[52]

Of course, the complaint's attack on the Merrill Lynch fairness opinion is relevant to whether there is a basis for determining that Republic received so little consideration in the Merger that the Merger might be deemed wasteful. The complaint is detailed in its discussions of the flaws in the Merrill Lynch fairness opinion.[53] But the complaint does not plead facts that show that, if properly conducted, a fairness opinion would have valued AutoNation at such a low level that no rational person would have thought AutoNation worth the Republic stock required to be paid under the Merger Exchange Ratio. Furthermore, the complaint is wholly devoid of any allegations discussing the actual business

48. *Id.* at ¶ 22.

49. *Id.* at ¶ 21.

50. *Id.* at ¶ 21.

51. *In re 3COM Corp. Shareholders Litig.,* mem. op. at 12–14.

52. *See Steiner v. Meyerson,* mem. op. at 13–14, 1995 WL 441999 at *5, 1995 Del. Ch. LEXIS 95, at *16–17 (holding that a complaint stated

an unfairness claim but did not state a claim satisfying the more rigorous waste standard).

53. But, of course, the complaint fails to note that the mid-point of the valuation ranges given by Merrill Lynch well exceed $250 million, the value of the deal when the Exchange Ratio was originally fixed. *See* note 7, *supra.*

plans of AutoNation, the number and locations of its proposed megastores, or other pertinent allegations specifically bearing on the value of AutoNation. That is, the complaint does not plead *facts* denigrating AutoNation's value; it simply pleads conclusions. Indeed, the complaint in some respects may be read as saying that there was no way at all to value AutoNation because it was a start-up.

Nor do the complaint's allegations about what happened after the Merger buttress a waste claim. In this regard, it is worth quoting the complaint's allegations in that respect in full:

> 47. The folly of the Merger was unveiled when AutoNation demonstrated that it could not profit—indeed it could not avoid enormous losses—in its used car business. On January 29, 1998, Republic reported that it had taken a $150 million restructuring charge against earnings to combine its franchised AutoNation dealership for new cars and AutoNation's used-car operations into one automotive retail division. Further, in January 1998, Republic told analysts that it would no longer report business segment information on AutoNation's used car business separately from new car sales. Thus, to conceal the ill-conceived nature and poor results of its used-car AutoNation acquisition, Republic buried its used-car tracks under its new-car business.

At oral argument, the plaintiff cited this paragraph as stating the most compelling facts supporting its waste claim.

What is most striking about this paragraph is what it does not say. It does not say that Republic is no longer operating used car megastores; it says that "Republic told analysts that it would no longer report business segment information on AutoNation's used car business separately

from new car sales." Somehow I am supposed to infer from the restructuring charge that the AutoNation concept "could not profit" and that the restructuring was designed to conceal the "ill-conceived nature" of the Merger.

But at bottom, is there any "there there" from which I can infer any such thing? The amended complaint was filed nearly two years after the Merger. The plaintiff has had the opportunity to develop, through many sources, facts to plead. Yet it cannot even straightforwardly plead that the AutoNation operations in fact lost money for Republic after the Merger. Even taking as true the implicit and wholly conclusory assertion that the used car concept was not profitable in its first year and a half and the allegation that Republic took a charge against earnings to consolidate its new and used car operations "into one retail automobile division," the complaint fails to state facts from which one can infer that the Merger was so irrational that no reasonable investor could support it as a fair exchange. It is hardly uncommon for new businesses to not profit in their first few years of operations; the marketplace may, as the current "Internet company" vogue proves, still place a high value on them. Moreover, the fact that Republic decided to consolidate its automobile operations in one division hardly supports the inference that it did so to bury the "poor results of its used-car AutoNation acquisition." Lacking in the complaint is any basis in fact (e.g., an allegation that Republic has abandoned the used car industry altogether because it was unprofitable or that it is not using the megastore locations identified and open pursuant to AutoNation's business plan) that would support the inflammatory conclusions asserted.[54]

Also of importance is the fact that there is no allegation of facts that would have led

---

54. The plaintiff's briefs contain the same sort of conclusory rhetoric. For example, the plaintiff's letter reply in support of its waste claim states that Republic made a "worthless investment in AutoNation, a mere concept which Republic abandoned barely one year after the closing" and that Republic "got nothing" in return for buying AutoNation. Yet no facts are stated to support these assertions.

a person of ordinary business judgment to conclude that it was certain or even likely that the AutoNation concept would fail *as of the time the Merger was consummated.* Risk and reward are both elements of capitalism, and the former goes with the opportunity for the latter. The fact that a purchase transaction did not yield hoped-for returns does not mean that the assets purchased were valueless at the time of the purchase.

At best, the complaint barely states a claim premised on the bottom-line proposition that the Merger was unfair because Republic paid a rather high price for a risky, start-up company owned by key Republic insiders.[55] The complaint does not plead facts that, if true, would support an inference that no person of sound business judgment would have believed it a good idea for Republic to consummate the Merger.

I am conscious that my decision is not the "safe" one, in the sense that it is almost always possible for a trial judge, given our liberal notice pleading standards, to craft a logical basis for determining that a claim is best resolved after discovery. Taking that option in this case would work an injustice. The plaintiff filed this action in April 1996. Only after threats of dismissal for failure to prosecute did the plaintiff file the amended complaint, some two years later. During the entire course of the litigation, the plaintiff has made little or no effort to prosecute its claims.

Not only that, the plaintiff scrupulously avoided the inclusion in its complaint of factual statements in the Proxy Statement that it has not claimed are false in its disclosure count, and which, if true, under-cut both its fairness and waste claims.[56] *The plaintiff has even blinded itself and therefore me to the fact that Republic is now called AutoNation because its automobile retailing operations are its leading business.* Although I cannot rely upon those facts in ruling on this motion, the complaint's exclusion of them is noteworthy because it demonstrates the necessity for the court to require a complaint to survive on well-pleaded factual allegations, not just conclusory adjectival assaults. The costs to stockholders of representative litigation are too substantial to do otherwise.

Indeed, these costs have caused me to consider whether there is a sufficient policy basis to continue to allow plaintiffs to claim that transactions that fully informed, disinterested stockholders have approved were wasteful. With the reader's indulgence, I will now turn to that issue, which, though not case-dispositive, has important practical implications for corporations and stockholders.

### 4. *Why Doesn't A Fully Informed, Uncoerced Vote Of Disinterested Stockholders Foreclose A Waste Claim?*

 Although I recognize that our law has long afforded plaintiffs the vestigial right to prove that a transaction that a majority of fully informed, uncoerced independent stockholders approved by a non-unanimous vote was wasteful, I question the continued utility of this "equitable safety valve." [57]

The origin of this rule is rooted in the distinction between voidable and void acts,[58] a distinction that appears to have

---

55. *In re 3COM Shareholders Litig.,* mem. op. at 14 ("[b]are allegations" that stock options were "excessive or even lavish" are insufficient to demonstrate that the corporation did not benefit from the grants and that "they, therefore, amounted to gratuity and corporate waste").

56. *See, e.g.,* the facts adverted to in notes 7, 10, and 11, *supra.*

57. R.F. Balotti and J.A. Finkelstein, 1 *The Delaware Law of Corporations & Business Organizations* § 4.35, at 4–234 (3rd ed.1997) (hereinafter *"Balotti & Finkelstein"* ).

58. In *Michelson v. Duncan,* our Supreme Court stated that:
 The essential distinction between voidable and void acts is that the former are those which may be found to have been performed in the interest of the corporation

grown out of the now largely abolished *ultra· vires* doctrine. Voidable· acts are traditionally held to be ratifiable because the corporation can lawfully accomplish them if it does so in the appropriate manner. Thus if directors who could not lawfully effect a transaction without stockholder approval did so anyway, and the requisite approval of the stockholders was later attained, the transaction is deemed fully ratified because the subsequent approval of the stockholders cured the defect.

In contrast, void acts are said to be non-ratifiable because the corporation cannot,

in any case, lawfully accomplish them.[59] Such void acts are often described in conclusory terms such as *"ultra vires"* or "fraudulent" or as "gifts or waste of corporate assets." [60] Because at first blush it seems it would be a shocking, if not theoretically impossible, thing for stockholders to be able to sanction the directors in committing illegal acts or acts beyond the authority of the corporation, it is unsurprising that it has been held that stockholders cannot validate such action by the directors, even on an informed basis.[61]

One of the many practical problems [62] with this seemingly sensible doctrine is

---

but beyond the authority of management, as distinguished from acts which are ultra vires, fraudulent or gifts or waste of corporate assets. The practical distinction, for our purposes, is that voidable acts are susceptible to cure by shareholder approval while void acts are not.

It is the law of Delaware, and general corporate law, that a validly accomplished shareholder ratification relates back to cure otherwise unauthorized acts of officers and directors.... It is only where a claim of gift or waste of assets, fraud or *ultra vires* is asserted that less than unanimous shareholder ratification is not a full defense.

407 A.2d at 218–19 (citations omitted); *see also Keenan v. Eshleman*, Del.Supr., 2 A.2d 904, 909 (1938) (earlier Delaware case adopting this rule).

**59.** C.R.P. Keating and J. Perkowitz–Solheim, 2A *Fletcher Cyclopedia Corporations* § 752, at 500 (rev. ed.1992) (hereinafter "2A *Fletcher*"); *see also* 2 V. Morawetz, *A Treatise On The Law Of Private Corporations* § 622, at 588 (2d ed. 1886) (hereinafter *"Morawetz"*) ("Even the majority at a shareholders' meeting cannot ratify an act in violation of the company's charter, for the powers of the majority are derived wholly from the charter itself."). I do not mean to imply by using this phraseology that the act itself is necessarily " 'illegal' in the sense that the [act] is expressly or impliedly prohibited by a statute or the charter, or against morals, or against public policy." S.M. Flanagan, 7A *Fletcher Cyclopedia Corporations* § 3400, at 12 (rev. ed.1997) (hereinafter "7A *Fletcher*"). Rather, I refer to an act that is beyond the corporation's power either because it is illegal or, if not illegal, is otherwise beyond the authority of the corporation under its charter to accomplish.

**60.** *E.g., Michelson v. Duncan*, 407 A.2d at 218–19.

**61.** One of the most emphatic iterations of this approach was issued by the United States Supreme Court in *Central Transportation Co. v. Pullman's Palace Car Co.* In that case, the Court stated in part:

A contract of a corporation, which is *ultra vires*, in the proper sense, that is to say, outside the object of its creation as defined in the law of its organization, and therefore beyond the powers conferred upon it by the legislature, is not voidable only, but wholly void, and of no legal effect. The objection to the contract is, not merely that the corporation ought not to have made it, but that it could not make it. The contract cannot be ratified by either party, because it could not have been authorized by either. No performance on either side can give the unlawful contract any validity, or be the foundation of any right of action upon it.

139 U.S. 24, 59–60, 11 S.Ct. 478, 35 L.Ed. 55 (1891).

**62.** The multitude of problems caused by the broader doctrine of *ultra vires*, of which the waste vestige is a small part, have been largely addressed through statutory and case law changes that have essentially whittled the doctrine down to nothing. *See, e.g.*, Robert C. Clark, *Corporate Law* § 16.1, at 675 (1986) (hereinafter *"Clark"*) (describing the *"ultra vires* problem" as now being one "largely of historical interest" in the United States). As one distinguished commentator noted in 1927, "The doctrine of *ultra vires* while modern in development seems to rest on notions about corporations which originated at a time when corporations were created by special act and largely for public purposes for the exercise of special franchises." H.W. Ballan-

that its actual application has no apparent modern day utility insofar as the doctrine covers claims of waste or gift, except as an opportunity for Delaware courts to second-guess stockholders. There are several reasons I believe this to be so.

First, the types of "void" acts susceptible to being styled as waste claims have little of the flavor of patent illegality about them, nor are they categorically *ultra vires.* Put another way, the oft-stated proposition that "waste cannot be ratified" is a tautology that, upon close examination, has little substantive meaning. I mean, what rational person would ratify "waste"? Stating the question that way, the answer is, of course, no one.[63] But in the real world stockholders are not asked to ratify obviously wasteful transactions. Rather than lacking any plausible business rationale or being clearly prohibited by statutory or common law, the transactions attacked as waste in Delaware courts are ones that are quite ordinary in the modern business world.[64] Thus a review of the

Delaware cases reveals that our courts have reexamined the merits of stockholder votes approving such transactions as: stock option plans;[65] the fee agreement between a mutual fund and its investment advisor;[66] corporate mergers;[67] the purchase of a business in the same industry as the acquiring corporation;[68] and the repurchase of a corporate insider's shares in the company.[69] These are all garden variety transactions that may be validly accomplished by a Delaware corporation if supported by sufficient consideration, and what is sufficient consideration is a question that fully informed stockholders seem as well positioned as courts to answer.[70] That is, these transactions are neither *per se ultra vires* or illegal; they only become "void" upon a determination that the corporation received no fair consideration for entering upon them.

Second, the waste vestige is not necessary to protect stockholders and it has no other apparent purpose.[71] While

63. For a good illustration of a stark justification of the rule that approaches the issue in this rather tautological and therefore inarguable way, *see* George D. Hornstein, 1 *Corporation Law and Practice* § 358, at 457–58 (1959) (hereinafter *"Hornstein"*) ("The power of less than all to deal with the property of all shareholders, however, is not absolute. Less than all cannot—either in advance or after the event—validate out-right misappropriation, or transactions euphemistically called a 'gift' of corporate property, or other action which constitutes a fraud upon dissentients.... To hold otherwise – to rule that a fraud may be condoned without unanimous consent— would be a travesty on justice.").

64. *See Clark* § 5.3.2, at 178 (noting that the difference between forms of corporate misconduct that cannot be ratified (e.g., waste) "and ordinary unfairness is just a matter of degree").

tine, *Ballantine on Corporations* § 69, at 244 n.25 (1927) (hereinafter *"Ballantine"*); *see also* N.D. Lattin, *The Law of Corporations*, at 196 n.54 & 206 (1959) (hereinafter *"Lattin"*) (noting criticism of the *ultra vires* doctrine and indicating that the doctrine resulted from an "attempt to limit the corporation as a matter of social policy" that "failed").

65. *E.g., Gottlieb v. Heyden Chemical Corp.,* Del.Supr., 91 A.2d 57 (1952); *Rosenthal v. Burry Biscuit Corp.,* Del.Ch., 60 A.2d 106 (1948).

66. *Saxe v. Brady,* 184 A.2d 602.

67. *Weinberger v. United Financial Corp. of California,* Del.Ch., C.A. No. 5915, mem. op. at 28, 1983 WL 20290, at *12, 1983 Del. Ch. LEXIS 443, at *34, Hartnett, V.C. (Oct. 13, 1983) (finding no evidence of waste in case involving merger approved by fully informed stockholder vote).

68. *Lewis v. Hat Corp. of America,* Del.Ch., 150 A.2d 750 (1959).

69. *Kaplan v. Goldsamt,* Del.Ch., 380 A.2d 556 (1977).

70. *Lewis v. Vogelstein,* Del.Ch., 699 A.2d 327, 336 (1997) ("Courts are ill-fitted to attempt to weigh the 'adequacy' of consideration under the waste standard or, *ex post*, to judge appropriate degrees of business risk.").

71. One early commentator observed that the broader doctrine of *ultra vires,* if properly applied so as not to injure third parties who dealt with corporations without knowledge

I would hesitate to permit stockholders to ratify a blatantly illegal act—such as a board's decision to indemnify itself against personal liability for intentionally violating applicable environmental laws or bribing government officials to benefit the corporation—the vestigial exception for waste has little to do with corporate integrity in the sense of the corporation's responsibility to society as a whole. Rather, if there is any benefit in the waste vestige, it must consist in protecting stockholders.[72] And where disinterested stockholders are given the information necessary to decide whether a transaction is beneficial to the corporation or wasteful to it, I see little reason to leave the door open for a judicial reconsideration of the matter.

The fact that a plaintiff can challenge the adequacy of the disclosure is in itself a substantial safeguard against stockholder approval of waste.[73] If the corporate board failed to provide the voters with material information undermining the integrity or financial fairness of the transaction subject to the vote, no ratification effect will be accorded to the vote and the

---

that the corporations were acting beyond their authority, could "for the most part" only adequately be explained as necessary to protect stockholders. *Ballantine* § 69, at 245. Modern commentators agree:

> With today's reliance on the business judgment rule analysis rather than on an inflexible inquiry into the relative proximity of the challenged activity to the corporation's stated purposes, the question of the permissible spheres of a corporation's activities are largely internalized within the corporation's governance system. Third parties without actual knowledge of any limitations in the corporation's charter are properly protected. Any significant and harmful departures from the corporation's stated purposes are an intramural matter in which the executives responsible for the *ultra vires* acts are answerable in damages, provided their conduct is beyond the protection of the business judgment rule.

J.D. Cox, T.L. Hazen, and F.H. O'Neal, 1 *Corporations* § 4.7, at 4.17 (1999); H. Hovenkamp, *Enterprise and American Law, 1836–1937*, 59–63 (1991) (describing the evolution of the *ultra vires* doctrine from one concerned with constraining corporations for public policy reasons to one designed to protect stockholders through shareholder-instituted litigation).

Furthermore, elimination of the waste vestige would not prevent the court from voiding a transaction that offends some specific public policy. The interests of creditors would also seem to be accounted for by other means, such as Delaware's Fraudulent Conveyances statute. 6 *Del. C.* § 1301 *et seq.*

**72.** That the Delaware case law allows the ratification of "waste" by a unanimous vote demonstrates that the rationale for the exception must be based on the protection of minority stockholder interests, rather than the protection of society. The fact that the cases also arguably bar a non-dissenting, fully informed stockholder from attacking as wasteful a transaction he supported as a voter also bolsters this conclusion. *Bershad v. Curtiss–Wright Corp.*, Del.Supr., 535 A.2d 840, 848 (1987). As a matter of strict theory, a "void" act cannot be ratified by any vote because the act is beyond the lawful power of the corporation itself. *Pullman's Palace Car Co.*, 139 U.S. at 48–49, 11 S.Ct. 478. As a result, one leading treatise reads the Delaware cases as affording a unanimous vote an estoppel effect "depriving the shareholders of a cause of action on the issue." 2A *Fletcher* § 764, at 550; *cf.* 7A *Fletcher* § 3432, at 38 (noting that preventing ratification of *ultra vires* acts that are not illegal or void is "clearly unsound and erroneous since the only real basis of the [*ultra vires* ] defense is protection of the shareholders").

**73.** *See generally In re The Walt Disney Co. Derivative Litig.*, 731 A.2d at 369–72 (discussing how robust the duty of disclosure is under Delaware corporate law); *see also Matador Capital Management Corp. v. BRC Holdings, Inc.*, Del.Ch., 729 A.2d 280, 295 (1998) (enjoining transaction in order to require dissemination to stockholders of additional disclosures where directors, when recommending that the stockholders accept a bid, failed to disclose information about their actions bearing on whether the directors fulfilled their fiduciary duty to seek the transaction offering the best value to the stockholders); *Sonet v. Plum Creek Timber Co.*, C.A. No. 16931, mem. op. at 19, 33, 1999 WL 160174, at *6, *11, 1999 Del. Ch. LEXIS 49, at *25, *45, Jacobs, V.C. (Mar. 18, 1999) (enjoining transaction until misleading disclosures were corrected); *cf. In re Tri–Star Pictures, Inc. Litig.*, Del. Supr., 634 A.2d 319, 333–34 (1993) (emphasizing the ease with which plaintiffs can obtain monetary damages if they demonstrate a breach of the "duty of disclosure" negatively affecting economic or voting rights).

plaintiffs may press all of their claims.[74] As a result, it is difficult to imagine how elimination of the waste vestige will permit the accomplishment of unconscionable corporate transactions, unless one presumes that stockholders are, as a class, irrational and that they will rubber stamp outrageous transactions contrary to their own economic interests.

In this regard, it is noteworthy that Delaware law does not make it easy for a board of directors to obtain "ratification effect" from a stockholder vote. The burden to prove that the vote was fair, uncoerced, and fully informed falls squarely on the board.[75] Given the fact that Delaware law imposes no heightened pleading standards on plaintiffs alleging material

nondisclosures or voting coercion and given the pro-plaintiff bias inherent in Rule 12(b)(6), it is difficult for a board to prove ratification at the pleading stage. If the board cannot prevail on a motion to dismiss, the defendant directors will be required to submit to discovery and possibly to a trial.

Nor is the waste vestige necessary to protect minority stockholders from oppression by majority or controlling stockholders.[76] Chancellor Allen recently noted that the justification for the waste vestige is "apparently that a transaction that satisfies the high standard of waste constitutes a *gift* of corporate property and no one should be forced against their will to make a gift of their property." [77] This justifica-

---

**74.** *See, e.g., Smith v. Van Gorkom,* Del.Supr., 488 A.2d 858, 893 (1985); *Solomon v. Armstrong,* 747 A.2d at 1128, 1999 Del. Ch. LEXIS 62, at *80.

**75.** *Id.*

**76.** *See Rogers v. Hill,* 289 U.S. 582, 591–92, 53 S.Ct. 731, 77 L.Ed. 1385 (1933) (stating that "majority stockholders have no power to give away corporate property against the protest of the minority") (citation and quotations omitted).

**77.** *Lewis v. Vogelstein,* 699 A.2d at 335–36; *see also Gottlieb v. Heyden,* 91 A.2d at 58–59 (If a transaction's reasonableness to the corporation is "within the realm in which reasonable men, fully informed and acting in good faith, may be expected to differ, then the court will enter judgment for the defendant. Within this realm the majority may enforce its will upon a dissenting minority; outside it they may not.").

Some older authorities imply that the waste vestige is subsumed within a larger *ultra vires* doctrine concern that minority stockholders should not have to assume the risk of investments or activities not authorized by the corporate certificate. As Ballantine stated:

Nothing, therefore, is now more surely settled in the law of corporations than the doctrine that any unauthorized act or contract by the directors or a majority of the stockholders of a corporation, which will destroy the existence of the corporation, or render it unable to perform its functions, or any misapplication or diversion of assets to purposes not authorized by its charter, even though all other stockholders may consent,

is a breach of obligation towards a dissenting stockholder, against which he is entitled to relief in equity. Any stockholder, therefore, may maintain a bill in equity in his own name, if he is not estopped, to enjoin a threatened misapplication or diversion of its assets, or to enjoin or set aside *ultra vires* acts or contracts which will result in such a misapplication or diversion, or which may destroy the corporation, or render it unable to carry out its objects. No majority of stockholders, however large, may ratify or sanction the misapplication of the capital to purposes unauthorized by the charter.

*Ballantine* § 187, at 615; *see also Lattin,* at 192–93 (describing the debate in England in the nineteenth century about whether even unanimous stockholder approval of a transaction between a corporation and a third party that was beyond a corporation's charter powers was sufficient to validate the contract). In general, however, the authorities do little to justify or explain the waste vestige; they simply state it as a given. *See, e.g., Michelson v. Duncan,* 407 A.2d at 219 (*citing* [18B] Am. Jur.2d Corporations § 1497, which contains no justification); *Keenan,* 2 A.2d at 909; *Rosenthal v. Burry,* 60 A.2d at 109–10; *Kerbs v. California Eastern Airways, Inc.,* Del.Supr., 90 A.2d 652, 655 & 659 (1952); *Putterman v. Daveler,* Del.Ch., 134 A.2d 480, 484 (1957); *Saxe v. Brady,* 184 A.2d at 610; *Kaplan v. Goldsamt,* 380 A.2d at 567–68; 18B *Am. Jur.2d Corporations* § 1497 (1999); 2A *Fletcher* § 764, at 550–51; E.L. Folk, R. Ward, Jr., and E.P. Welch, *Folk on the Delaware General Corporation Law* §§ 144.5.2 & 144.5.2.1 (hereinafter *"Folk"*); *Balotti & Finkelstein* § 4.35; D.A. Drexler, L.S. Black, Jr., and A.G. Sparks, III, *Delaware Corporation Law and*

tion is inadequate to support continued application of the exception. As an initial matter, I note that property of the corporation is not typically thought of as personal property of the stockholders, and that it is common for corporations to undertake important value-affecting transactions over the objection of some of the voters or without a vote at all.

 In any event, my larger point is that this solicitude for dissenters' property rights is already adequately accounted for elsewhere in our corporation law. Delaware fiduciary law ensures that a majority or controlling stockholder cannot use a stockholder vote to insulate a transaction benefiting that stockholder from judicial examination. Only votes controlled by stockholders who are not "interested" in

the transaction at issue are eligible for ratification effect[78] in the sense of invoking the business judgment rule rather than the entire fairness form of review.[79] That is, only the votes of those stockholders with *no* economic incentive to approve a wasteful transaction count.[80]

Indeed, it appears that a corporation with a controlling or majority stockholder may, under current Delaware law, never escape the exacting entire fairness standard through a stockholder vote, even one expressly conditioned on approval by a "majority of the minority." Because of sensitivity about the structural coercion that might be thought to exist in such circumstances, our law limits an otherwise fully informed, uncoerced vote in such circumstances to having the effect of making

---

*Practice* § 15.05[4], at 15–23–24 (1999); American Law Institute, *Principles of Corporate Governance: Analysis and Recommendations* § 5.02(a)(2)(D), Comments, & Reporter's Note (1994 and 1999).

**78.** In using the word ratification in this opinion, I am keenly aware that " 'classic ratification' " involves the "voluntary addition of an independent layer of shareholder approval in circumstances where such approval is not legally required." *In re Wheelabrator Technologies Shareholders Litig.*, Del.Ch., 663 A.2d 1194, 1201–02 n. 4 (1995). Indeed, my colleague Vice Chancellor Steele recently noted that it was oxymoronical to call a necessary stockholders' vote in advance of a transaction's consummation "advance ratification." *In re 3COM Corp. Shareholders Litig.*, mem. op. at 9. For want of better nomenclature, I use the term as describing a stockholder vote sufficient to invoke the business judgment rule standard of review. *In re Wheelabrator*, 663 A.2d at 1201–02 n. 4 (" '[S]hareholder ratification' has now acquired an expanded meaning intended to describe any approval of challenged board action by a fully informed vote of shareholders, irrespective of whether that shareholder vote is legally required for the transaction to attain legal significance.").

**79.** *E.g., Lewis v. Hat Corp. of America*, 150 A.2d at 752 n. 3 (examining whether a majority of the voters without an interest in the proposed transaction voted for it before giving ratification effect to the vote); *see generally* Folk § 144.5.2.3, at 144:14–16 (discussing fairness).

**80.** A non-comprehensive review of the treatises suggests that the law earlier in the century was far less clear about whether "interested" persons could vote as stockholders to ratify or approve transactions. *Ballantine* § 124, at 395 (suggesting that interested votes counted to ratify a self-interested contract between a director and a company); *Clark* § 5.3 at 179 (indicating that older case law enabled interested stockholders to ratify a transaction, rendering the transaction valid, and not necessarily void, but somewhat contradictorily left the transaction open to attack by dissenting stockholders on fairness grounds); *Hornstein* § 439, at 545 (interested vote counts towards ratification but ratification by interested votes will not be given as much weight by the courts); 2 *Morawetz* § 622, at 588–89 (quoting an 1877 case in which the accused wrongdoer appears to have controlled a majority of the voting shares for the proposition that " '[t]o hold that a corporation could gratuitously condone or release ... a fraud, by anything short of unanimous consent, would be monstrous; for it would be in effect to hold that president or director who can control a majority vote in the corporation may rob or despoil it with impunity ....' ") (*quoting Hazard v. Durant*, 11 R.I. 195 (1875)); *see also* Note, "Shareholders Ratification of Directors' Fraudulent Acts," 53 *Harvard L.Rev.* 1368, 1371 & n.17 (1940) (hereinafter *"Shareholders Ratification"*) (noting that the defrauding defendants in *Hazard* "did control a majority of the stock" and suggesting that the *Hazard* rule has little force "unless the majority of the stock is controlled by the 'despoiling' directors").

the plaintiffs prove that the transaction was unfair.[81] Doubtless defendants appreciate this shift, but it still subjects them to a proceeding in which the substantive fairness of their actions comes under close scrutiny by the court – the type of scrutiny that is inappropriate when the business judgment rule's presumption attaches to a decision.

Third, I find it logically difficult to conceptualize how a plaintiff can ultimately prove a waste or gift claim in the face of a decision by fully informed, uncoerced, independent stockholders to ratify the transaction. The test for waste is whether any person of ordinary sound business judgment could view the transaction as fair.[82]

If fully informed, uncoerced, independent stockholders have approved the transaction, they have, it seems to me, made the decision that the transaction is "a fair exchange."[83] As such, it is difficult to see the utility of allowing litigation to proceed in which the plaintiffs are permitted discovery and a possible trial, at great expense to the corporate defendants, in order to prove to the court that the transaction was so devoid of merit that each and every one of the voters comprising the majority must be disregarded as too hopelessly misguided to be considered a "person of ordinary sound business judgment."[84] In this day and age in which

investors also have access to an abundance of information about corporate transactions from sources other than boards of directors, it seems presumptuous and paternalistic to assume that the court knows better in a particular instance than a fully informed corporate electorate with real money riding on the corporation's performance.

Finally, it is unclear why it is in the best interests of disinterested stockholders to subject their corporation to the substantial costs of litigation in a situation where they have approved the transaction under attack. Enabling a dissident who failed to get her way at the ballot box in a fair election to divert the corporation's resources to defending her claim on the battlefield of litigation seems, if anything, contrary to the economic well-being of the disinterested stockholders as a class. Why should the law give the dissenters the right to command the corporate treasury over the contrary will of a majority of the disinterested stockholders? The costs to corporations of litigating waste claims are not trifling.

Although there appears to be a trend in the other direction,[85] binding case law still emphasizes the ease with which a plaintiff may state a waste claim and the difficulty of resolving such a claim without a trial.[86] As in this case, proxy statements and oth-

---

**81.** *Kahn v. Lynch Communication Systems, Inc.* Del.Supr., 638 A.2d 1110, 1117 (1994); *In re Wheelabrator Technologies, Inc. Shareholders Litig.*, 663 A.2d at 1203, 1205.

**82.** *Michelson v. Duncan*, 407 A.2d at 224; *see also Saxe v. Brady*, 184 A.2d at 610.

**83.** *Michelson*, 407 A.2d at 224 (citation and quotations omitted). Indeed, our courts have considered a disinterested, uncoerced vote in favor of a transaction as substantive evidence disproving the wasteful nature of the transaction. *See, e.g., Saxe*, 184 A.2d at 611–12.

**84.** *Michelson*, 407 A.2d at 224. Admittedly, some distinguished commentators have a more jaded view of stockholders' ability to reject transactions not in their best interests. *See Clark* § 5.4, at 182 ("To summarize about the shareholder approval procedure as a way of policing basic self-dealing transactions: It

would be perverse for the legal system to have many such matters taken to the shareholders; folly to expect the shareholders to pass upon them in a careful, well informed way; and wrong to hold them to the consequences of their failing to do so.").

**85.** *Lewis v. Vogelstein*, 699 A.2d at 339; *Steiner v. Meyerson*, mem. op., 1995 Del. Ch. LEXIS 95; *In re 3COM Corp. Shareholders Litig.*, mem. op. at 10–14.

**86.** *Michelson v. Duncan*, 407 A.2d at 223 ("[c]laims of gift or waste of corporate assets are seldom subject to disposition by summary judgment"); *see also Haft v. Dart Group Corp.*, Del.Ch., C.A. No. 13736, 1994 WL 643185, at *3, 1994 Del. Ch. LEXIS 200, at *7–8, Allen, C. (Nov. 14, 1994).

er public filings often contain facts that, if true, would render waste claims wholly without merit. Plaintiffs' lawyers (for good reason) rarely put such facts in their complaints and it is doubtful that the court can look to them to resolve a motion to dismiss a waste claim even where the plaintiff has not pled that the facts in the public filings are not true.[87] Given this reality and the teaching of prior cases, claims with no · genuine likelihood of success can make it to discovery and perhaps to trial. To the extent that there is corporate waste in such cases, it appears to be some place other than in the corporate transactions under scrutiny.

For all these reasons, a reexamination of the waste vestige would seem to be in order.[88] ˙ Although there may be valid reasons for its continuation, those reasons should be articulated and weighed against the costs the vestige imposes on stockholders and the judicial system. Otherwise,

inertia alone may perpetuate an outdated rule fashioned in a very different time.[89]

### 5. *Does Count II State A Claim That The Proxy Statement And Therefore The Vote On The Merger Were Tainted By Material Misdisclosures?*

 · The Republic directors had a duty to disclose all material information to the Republic stockholders when they sought stockholder approval of the Merger.[90] "The materiality standard requires directors to disclose all facts which, under all the circumstances, would have assumed actual significance in the deliberations of [a] reasonable shareholder." [91]

In defending against this Rule 12(b)(6) motion, the plaintiff relies upon only one aspect of the Proxy Statement that it asserts is materially misleading: the Proxy Statement's discussion of the Loan Agreement.[92] The misleading nature of the discussion rests on one alleged fact:

87. *Vanderbilt Income and Growth Assocs., L.L.C. v. Arvida/JMB Managers, Inc.*, Del. Supr., 691 A.2d 609, 613 (1996), emphasizes the limited circumstances in which it is appropriate to consider matters outside the pleadings on a Rule 12(b)(6) motion.. It is unlikely that a proxy statement is integral to a waste claim simply because the plaintiff also pleads a disclosure claim and relies on the proxy statement in that respect.

88. This could be a part of an overdue clarification of the now "tortured" state of Delaware's law on the burden-shifting effect of disinterested shareholder approval. *Solomon v. Armstrong*, 747 A.2d at 1114, 1999 Del. Ch. LEXIS 62, at *33; *see also In re Wheelabrator*, 663 A.2d at 1204–05.

89. *See Onti, Inc. v. Integra Bank*, Del.Ch., 751 A.2d 904, 929, 1999 Del. Ch. LEXIS 130, at * 73, Chandler, C. (1999, rev. July 1, 1999) (*citing* Oliver Wendell Holmes, *The Path of Law* 187 (1921)). A perceptive student noted in 1940 that the blanket proposition that "fraud cannot be ratified" by even disinterested stockholders lacked an adequate rationale. The student feared, however, that "[f]requent reiteration of the statement may induce blind faith in the wisdom of its application, and the oversimplified formula—that shareholders may not ratify directors' frauds—may become an unyielding major premise in the law of

corporate powers." . *Shareholders Ratification*, 53 *Harv. L.Rev.* at 1375. These fears seem to have been borne out in the case of the waste vestige.

90. *In re Santa Fe Pacific Shareholder Litig.*, 669 A.2d at 66.

91. *Id.* (quotations and citations omitted).

92. At oral argument, the plaintiff abandoned its argument that the Proxy Statement is deficient because it does not disclose that the funds forwarded to AutoNation under the Loan Agreement would not have to be repaid if the Merger was consummated. This concession was wise because the Proxy Statement made adequate disclosure that the funds forwarded to AutoNation under the Loan Agreement would not have to be repaid if the Merger was approved. Republic was buying all of AutoNation. A reasonable investor knows that the acquiring corporation usually assumes the debts of the acquired corporation in a merger. For Republic investors who did not know that, the Proxy Statement expressly stated that "[t]he assets and *liabilities* ... of AutoNation will be consolidated into the assets and liabilities ... of Republic subsequent to the Effective Time [of the Merger]." P.S. at 5 (emphasis added).

That the Proxy Statement did not disclose the actual amount of funds provided from Republic to AutoNation between September 30, 1999 and the time when the Proxy Statement was mailed. According to plaintiff, this omission was material because the amount of the funds jumped from $112,900,000 as of September 30, 1996 to $247.5 million on December 31, 1996.

This allegation does not support a disclosure claim.

■ While it is true that the Proxy Statement did not disclose the actual amount of lending from Republic to Auto-Nation from September 30, 1996 onward, it did disclose other facts that informed the Republic stockholders that Republic might lend $250 million *or more* to AutoNation before the Merger closed. First, the Proxy Statement makes abundantly clear that AutoNation was a start-up with tremendous capital needs. The Proxy Statement also indicates that the costs and expenses incurred by AutoNation had been ramping up as the company brought operations on line. In that regard, the Proxy Statement set forth a schedule indicating that the first eight AutoNation megastores had been brought on line as of December 3, 1996 and that nine new stores were projected to open within the half year thereafter. A reasonable reader of the Proxy Statement could draw no other conclusion than that the AutoNation acquisition would bring with it the requirement that Republic make immediate and significant investments in that new business.

Second, the Proxy Statement indicates that Republic had provided AutoNation with $112.9 million during the period May 1996 to September 30, 1996—the end date for Republic's last complete fiscal quarter before the proxy materials went out. The Proxy Statement also indicated that the pace of AutoNation operations would be increasing in the fall of 1996. The Proxy

Statement states that the Loan Agreement was a source of additional capital for Auto-Nation and that "[t]he Loan Agreement will provide AutoNation with financing to fund its cash flow needs through December 29, 1996 and during the period that planned principal operations commence." [93] Therefore, it is impossible to draw the inference from the Proxy Statement that the $112.9 million was the maximum amount Republic would lend AutoNation under the Loan Agreement before the Merger vote.

Finally, the Proxy Statement included a copy of an October 31, 1996 amendment to the Loan Agreement. Among other things, the Amendment authorizes Auto-Nation to procure a $250 million credit facility for the purpose of funding land acquisitions. Republic agreed to guarantee AutoNation's obligations under that credit agreement. In addition, the Amendment indicates Republic's agreement to lend $150 million to AutoNation on top of the loans it had already obligated itself to make under the Loan Agreement. These funds were to help finance the purchase of vehicle inventories—a purpose consistent with the schedule of megastore openings set forth in the Proxy Statement. Thus the Amendment's express terms committed Republic to provide up to $400 million in additional financing before December 31, 1996.

Perhaps it would be have been clearer for the Proxy Statement to have indicated the total amount of financing Republic was obligated to provide AutoNation before the Merger closed. But that omission was not material in the overall mix of what was disclosed about the increasing cost of AutoNation's capital needs, Republic's provision of $112.9 million in capital as of September 30, 1996, the terms of the Loan Amendment, and Republic's commitment to finance AutoNation's operations until the Merger closed.[94] A reasonable inves-

**93.** P.S. at 37.

**94.** *Loudon v. Archer–Daniels–Midland .Co.,* Del.Supr., 700 A.2d 135, 143 (1997) (omission

tor had all the information she needed to determine that the Merger was obligating Republic to acquire a risky start-up company with large capital costs.

Because this is the only flaw asserted in the complaint, dismissal of Count II is required.

### III. *Conclusion*

For the foregoing reasons, the defendants' motion to dismiss under Chancery Court Rule 23.1 is DENIED, but the defendants' motion to dismiss under Chancery Court Rule 12(b)(6) is GRANTED. IT IS SO ORDERED.

is material only if there is a "substantial likelihood" that the omitted fact "would have been viewed by the reasonable stockholder as having significantly altered the 'total mix' of information made available") (citations omitted).