# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| IN RE SOLERA HOLDINGS, INC. STOCKHOLDER LITIGATION | CONSOLIDATED C.A. No. 11524-CB |

# MEMORANDUM OPINION

Date Submitted: October 13, 2016
Date Decided: January 5, 2017

R. Bruce McNew and Andrea S. Brooks, WILKS LUKOFF & BRACEGIRDLE LLC, Wilmington, Delaware; Randall J. Baron, David T. Wissbroecker, Maxwell R. Huffman, and Eun Jin Lee, ROBBINS GELLER RUDMAN & DOWD LLP, San Diego, California, *Attorneys for Plaintiff City of Warren Police and Fire Retirement System*.

Raymond J. DiCamillo, Kevin M. Gallagher, and Sarah A. Clark, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Brian T. Frawley and Chimnomnso N. Kalu, SULLIVAN & CROMWELL LLP, New York, New York, *Attorneys for Defendants Tony Aquila, Stuart J. Yarbrough, Thomas C. Wajnert, Thomas A. Dattilo, Kurt J. Lauk, Arthur Kingsbury, Patrick D. Campbell, and Michael E. Lehman*.

William M. Lafferty and D. McKinley Measley, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware, *Attorneys for Defendants Vista Equity Partners Fund V, L.P., Summertime Holding Corporation, and Summertime Acquisition Corporation*.

**BOUCHARD, C.**

In this action, a former stockholder of Solera Holdings, Inc. challenges a private equity firm's acquisition of the company for $55.85 per share or a total of approximately $3.7 billion in a merger that closed in March 2016. The transaction followed a sale process that involved the solicitation of numerous financial firms and strategic companies, and a go-shop designed to permit Solera to continue its discussions with an additional strategic company that surfaced during the solicitation period. That company ultimately decided not to bid higher during the go-shop period, citing a decline in its stock price and volatility in the financing markets.

The complaint asserts a single claim for breach of fiduciary duty against the eight members of Solera's board who approved the transaction, seven of whom were outside directors. The transaction did not involve a controlling stockholder, and the independence and disinterestedness of the outside directors has not been challenged seriously. As such, plaintiff sensibly does not contend that the transaction is subject to entire fairness review, but does contend that it calls for enhanced scrutiny under *Revlon* and its progeny.

Defendants have moved to dismiss the complaint for failure to state a claim for relief. As explained below, I conclude based on longstanding doctrine reaffirmed in *Corwin v. KKR Financial Holdings LLC* that the Solera board's decision to approve the transaction is subject to the business judgment presumption because, in a fully-informed and uncoerced vote, a disinterested majority of Solera's

stockholders approved the merger, which offered them a 53% unaffected premium for their shares. The complaint thus must be dismissed because it is not alleged that the board's decision to approve the merger constituted waste.

## I. BACKGROUND

Unless noted otherwise, the facts recited in this opinion come from the allegations of the Verified Consolidated Amended Complaint (the "Complaint") and the documents incorporated therein.

### A. The Parties

Solera Holdings, Inc. ("Solera" or the "Company") is a provider of risk and asset management software and services to the automotive and property marketplace, including the global property and casualty insurance industry. Founded in 2005, Solera went public in May 2007. As of October 26, 2015, Solera had approximately 67.2 million shares of common stock outstanding. In March 2016, Solera merged with an affiliate of Vista Equity Partners ("Vista") in the transaction that is the subject of this action (the "Merger").

Plaintiff City of Warren Police and Fire Retirement System alleges it held shares of Solera common stock at all relevant times.

The Complaint names as defendants the eight members of Solera's board of directors during the sale process that led to the Merger. Defendant Tony Aquila was Solera's founder, President, CEO, and Chairman of the board. Aquila was the only

2

management-director on Solera's eight-member board. Defendants Stuart J. Yarbrough, Thomas A. Dattilo, and Patrick D. Campbell served on the special committee the board formed in July 2015 to consider the Company's strategic alternatives. Datillo and Campbell also served on the board's Compensation Committee, along with Thomas C. Wajnert.

## B. Solera Explores a Potential Sale

Over a two-year period before May 2015, Aquila engaged in informal discussions with private equity firms regarding a potential go-private transaction. Through these discussions, Aquila allegedly learned that "although strategic acquirers were likely to pay more for the Company, only private equity buyers were likely to provide him post-merger employment and investment opportunities."[1]

On May 6, 2015, during a conference call after Solera released its third quarter report, Aquila made the following comment that allegedly put Solera in play: "[W]e got the short game playing out there. And we've got to thread the needle. And the only other option to that is to go private."[2] After the call, Aquila had discussions with several private equity firms regarding a potential transaction.

On July 19, 2015, Solera received a written indication of interest from a private equity firm ("Party A") for an all-cash acquisition of the Company at a price

---

[1] Compl. ¶ 46.

[2] Compl. ¶ 49.

3

between $56 and $58 per share. Party A confirmed that it would agree to provide continuing roles for Aquila and his management team after the proposed transaction.

### C. The Sale Process Starts

On July 20, 2015, Solera's board formed a special committee consisting of Yarbrough, Campbell, and Dattilo (the "Special Committee") to consider the Company's strategic alternatives. Yarbrough was named Chairman of the Special Committee. On July 25, 2015, the Special Committee engaged Centerview Partners LLC ("Centerview") as its financial advisor.

On July 30, 2015, Centerview provided the Special Committee with a list of potential private equity and strategic buyers. The Special Committee instructed Centerview to contact six private equity firms and five strategic companies on the list, but excluded from this outreach effort a potential strategic buyer known as "Party B" because Party B was a competitor of the Company.

Between August 1 and August 10, 2015, Solera entered into confidentiality agreements with Vista, Party A, and four other private equity firms—Parties C, D, E, and F. These confidentiality agreements contained standstill provisions that terminated automatically upon Solera's entry into a definitive agreement with respect to a sale transaction. On August 10, 2015, Centerview instructed Vista and Parties A, C, D, and F to submit written indications of interest by August 17, 2015.

On August 11, 2015, the Special Committee met with Centerview, Sullivan & Cromwell LLP, and Richards, Layton & Finger, P.A. to discuss ways to obtain financing for the potential private equity buyers. The Special Committee thereafter entered into confidentiality agreements with potential financing sources, including Goldman, Sachs & Co. and Koch Industries, and introduced Vista and Party A to potential financing partners. By the end of the first week of August, some of the strategic companies Centerview had contacted had dropped out of the process because they were involved in other transactions.

On August 17, 2015, Vista, Party A, and Party C submitted indications of interest to acquire Solera at $63 per share, $60 per share, and between $60 and $62 per share, respectively. Between August 18 and August 21, Solera entered into confidentiality agreements with Koch Equity Development, LLC, a subsidiary of Koch Industries, and three other potential financing sources.

**D.    Party B Enters the Sale Process after a News Leak**

On August 19, 2015, *Bloomberg* published an article indicating that Solera was exploring a potential sale with private equity firms, which caused Solera to issue a press release the next day announcing that it was "exploring a variety of strategic alternatives."[3]    Two days later, on August 21, Party B contacted Centerview

---

[3] Compl. ¶ 77.

indicating its interest in a potential transaction, which it expressed in writing the next day.

From August 21 to August 23, Party B's financial advisor indicated to Centerview that Party B would be able to offer a value in excess of the then-rumored highest bid of $63 per share. On August 24, 2015, Party B signed a confidentiality agreement. Around this time, the global equity markets declined sharply, with the MSCI Asia ex-Japan, MSCI Europe, and MSCI U.S. indices declining by 8.5%, 8.7%, and 8.6%, respectively.

On September 1, 2015, Party B submitted a written indication of interest to acquire the Company at a price between $55 and $58 per share consisting of 75% cash and 25% stock. On the same day, the Special Committee sent a draft merger agreement to Party A and Vista. On September 3, 2015, Party B submitted an increased offer at a price of $60 per share with an unspecified mix of consideration.

### E. The Board Approves the Merger with Vista

On September 4, 2015, Vista submitted a reduced offer at a price of $55 per share and Party A submitted a reduced offer at a price of $56 per share. Later that day, Centerview informed Vista that it would need to increase its price to at least $56 per share, which Vista agreed to do.

On September 8, 2015, Party A confirmed its $56 per share offer. That same day, Vista again reduced its offer, this time to $53 per share, which the Special

6

Committee stated was inadequate. On September 11, 2015, Party A submitted a reduced offer at $54 per share and Vista submitted a revised offer at $55.85 per share. On September 12, 2015, the Solera board unanimously approved a transaction whereby Vista would acquire the Company in a merger for $55.85 per share pursuant to an Agreement and Plan of Merger (the "Merger Agreement").

The Merger Agreement contained a 72-hour, renewing matching right provision that allowed Vista to match any offer, and a non-solicitation provision prohibiting the Company from soliciting any bidder other than Party B. As to Party B, the Merger Agreement contained a go-shop provision permitting the Company to continue discussions with Party B for 28 days after the date of the Merger Agreement. The Merger Agreement also contained a two-tiered termination fee provision designed to work in coordination with the go-shop provision. In the first tier, Party B would be required to pay Vista a termination fee of $38.15 million (about 1 percent of the equity value of the Merger) and to reimburse up to $5 million of its expenses if the Company terminated the Merger Agreement within the 28-day go-shop period to enter into an alternative transaction with Party B. In the second tier, any other successful bidder for the Company (or Party B if the Company did not terminate the Merger Agreement before the expiration of the 28-day go-shop) would be required to pay Vista a termination fee of $114.4 million (about 3 percent of the equity value of the Merger).

On September 13, 2015, Solera announced the Merger in a press release:

> Solera Holdings, Inc. . . . has entered into a definitive merger agreement . . . pursuant to which an affiliate of Vista Equity Partners . . . will acquire Solera in a transaction valued at approximately $6.5 billion . . . including the existing net debt of Solera. Other key investors include an affiliate of Koch Equity Development LLC . . . the investment and acquisition subsidiary of Koch Industries, Inc., and an affiliate of Goldman, Sachs & Co.
>
> Pursuant to the Merger Agreement, Vista will acquire 100% of the outstanding shares of Solera common stock for $55.85 per share in cash in the Merger. The purchase price represents an unaffected premium of 53% over Solera's closing share price of $36.39 on August 3, 2015.[4]

After this announcement, Solera provided Party B with access to the electronic data room compiled for the other prospective bidders, but excluded Party B from reviewing certain documents that the Company deemed to be "highly competitively sensitive."[5]

On September 29, 2015, twelve days before the expiration of the 28-day go-shop period, Party B's financial advisor informed the Company that it would not submit a proposal to acquire the Company due to, among other things, "recent downward movements in Party B's trading price and volatility in the financing markets."[6]

---

[4] Compl. ¶ 121. (quoting press release).

[5] Compl. ¶ 122.

[6] Compl. ¶ 122 (quoting Proxy Statement).

**F.** **The Compensation Committee Approves Certain Payments to Management During the Sale Process**

On August 11, 2015, in the midst of the sale process, the Special Committee discussed implementing a new management retention and compensation plan. On August 13, 2015, the Special Committee referred this issue to the Compensation Committee, which consisted of three members, two of whom (Datillo and Campbell) served on the Special Committee. Datillo was the chair of the Compensation Committee. The third member of the Compensation Committee was Thomas C. Wajnert.

On August 23, 2015, the Compensation Committee approved a retention plan that would pay an aggregate amount of $33 million to the Company's management team (the "Retention Plan"). Of the $33 million, Aquila was allocated $18 million, half of which was payable only upon the closing of a transaction, and the other half was due to be paid to him on August 22, 2016, even if the sale of the Company fell through.[7] The Retention Plan also allocated $815,000 to Renato Giger, the Company's Chief Financial Officer, and $3.5 million to Jason Brady, the Company's Senior Vice President, General Counsel, and Secretary. Both of these amounts were payable only upon the closing of a transaction.[8]

---

[7] Compl. ¶¶ 81, 84.

[8] Compl. ¶ 81.

9

On August 25, 2015, the Compensation Committee approved a $10 million special cash award to Aquila purportedly in recognition of Aquila's "contributions during fiscal 2015 above and beyond [his] actual achievements measured against his Annual Business Incentive Plan performance objectives" (the "Special Cash Award").[9] Solera paid the Special Cash Award to Aquila on August 27, 2015.[10]

The Complaint asserts that the $33 million Retention Plan "served no legitimate purpose" because there already were retention plans in place for Solera's management, including Aquila, Giger, and Brady.[11] In particular, the Company had granted various incentive awards to management in connection with "Mission 2020," a program that was established in August 2012 to grow the Company to $2 billion in revenue and $800 million in Adjusted EBITDA by 2020.[12] The Mission 2020 awards consisted of time-based awards and performance-based awards, both of which had a strike price of $58.33.[13]

Giger and Brady received "Mission 2020 Awards" in 2013 consisting of non-vested stock options and, as of October 28, 2015, stood to receive significant benefits

---

[9] Compl. ¶ 92 (quoting Proxy Statement).

[10] Compl. ¶ 100.

[11] Compl. ¶ 82.

[12] Compl. ¶ 24. Solera later raised the target to $840 million of Adjusted EBITDA in view of the strong financial performance of the Company. Compl. ¶¶ 35, 54.

[13] Compl. ¶ 124.

10

from Mission 2020 awards they had received previously in the form of performance-based restricted stock units (PSUs), restricted stock units (RSUs), and stock options.[14]   On March 9, 2015, separate from the Mission 2020 plan, the Compensation Committee awarded Aquila as a "retention award" shares of stock that would vest upon a merger having a current value of $3.5 million.[15]

On December 8, 2015, at the same meeting at which Solera's stockholders were asked to approve the Merger, the stockholders separately were asked to approve, on a non-binding advisory basis, compensation that would be paid to the Company's named executive officers (Aquila, Giger, and Brady) in connection with the Merger, including the payments due under the Retention Plan.[16]   Solera's stockholders rejected this proposal.  Because the stockholder vote was non-binding, plaintiff alleges (and defendants do not dispute) that Solera likely paid out the retention payments.

---

[14] Compl. ¶ 82 ("As of the filing of the Amended 10-K on October 28, 2015, the remaining balance Giger stood to receive after the first phase (the sooner of the end of fiscal year 2017 or a merger) of 2020 awards was $1,563,797 in PSU awards, $781,899 in RSU awards and $781,899 in stock options. The remaining balance Brady stood to receive after the first phase is $995,149 in PSU awards, $497,546 in RSU awards and $497,546 in stock options.").

[15] Compl. ¶ 82.

[16] Compl. ¶ 129.

## G.    Procedural History

On September 21, 2015, Edward A. Braunstein, a Solera stockholder, filed an action in this Court seeking to enjoin the consummation of the proposed Merger. On October 22, 2015, Braunstein filed an amended complaint, a motion for a preliminary injunction, and a motion for expedited proceedings.

In support of his motion for expedited proceedings, Braunstein challenged the sale process, in particular with respect to how Party B was treated, and argued that Solera's preliminary proxy statement, issued on October 5, 2015, was materially false and misleading in several respects. On November 5, 2015, after briefing and argument, I denied the motion to expedite, finding that the sale process and disclosure claims Braunstein had advanced were not colorable.[17]

On November 17, 2015, almost two weeks after the motion for expedited proceedings was denied in the *Braunstein* action, another stockholder of Solera—City of Warren Police and Fire Retirement System—filed a separate complaint in connection with the proposed Merger. On January 29, 2016, the *Warren* action was consolidated with the *Braunstein* action, and the City of Warren Police and Fire Retirement System was appointed as the lead plaintiff.

---

[17] *Braunstein v. Aquila*, C.A. No. 11524-CB, Transcript at 49-54 (Del. Ch. Nov. 5, 2015). The definitive proxy statement was issued before this hearing, on October 30, 2015.

On December 8, 2015, the stockholders of Solera voted to approve the Merger, which closed on March 3, 2016.[18]

On March 23, 2016, plaintiff City of Warren Police and Fire Retirement System filed a Verified Consolidated Amended Complaint (as defined above, the "Complaint") on behalf of a putative class of Solera's common stockholders. The Complaint asserts a single claim for breach of fiduciary duty against the eight members of Solera's board who approved the Merger.

On April 22, 2016, defendants moved to dismiss the Complaint under Court of Chancery Rule 12(b)(6) for failure to state a claim for relief. Argument on this motion was heard on October 13, 2016.

## II. ANALYSIS

This Court will grant a motion to dismiss under Court of Chancery Rule 12(b)(6) only if the "plaintiff could not recover under any reasonably conceivable set of circumstances susceptible of proof."[19] In making this determination, the Court will "accept all well-pleaded allegations as true and draw all reasonable inferences in the plaintiff's favor."[20] The Court is not required, however, to accept mere conclusory allegations as true or make inferences unsupported by well-pleaded

---

[18] Compl. ¶¶ 150-51.

[19] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Hldgs. LLC*, 27 A.3d 531, 536 (Del. 2011).

[20] *Norton v. K-Sea Transp. P'rs L.P.*, 67 A.3d 354, 360 (Del. 2013).

13

factual allegations.[21] The Court also "is not required to accept every strained interpretation of the allegations proposed by the plaintiff."[22]

The Complaint asserts a single claim for breach of fiduciary duty against the eight members of Solera's board concerning their approval of the Merger. More specifically, the Complaint alleges that the defendants improperly favored the interests of Aquila and the Company's management, failed to establish an effective Special Committee or to extract the highest price possible for the Company, implemented preclusive deal protection devices, and failed to disclose material information about the value of the Company's stock.[23]

Plaintiff does not assert that the Merger should be subject to entire fairness review, and no reason is apparent why it would be. The Merger did not involve a controlling stockholder, and plaintiff does not assert that a majority of the eight members of Solera's board, seven of whom were outside directors, were not independent or disinterested.[24] Plaintiff instead argues that the board's conduct of

---

[21] *In re Lukens Inc. S'holders Litig.*, 757 A.2d 720, 727 (Del. Ch. 1999), *aff'd sub nom. Walker v. Lukens, Inc.*, 757 A.2d 1278 (Del. 2000) (TABLE).

[22] *In re Gen. Motors (Hughes) S'holders Litig.*, 897 A.2d 162, 168 (Del. 2006).

[23] Compl. ¶ 162 (a)-(e).

[24] Plaintiff's counsel acknowledged during argument that they do not challenge the disinterestedness of the outside directors and that plaintiff's only challenge to their independence concerns the management compensation decisions made during the sale process, which only involved the three members of the Compensation Committee. Tr. Oral Arg. at 34-37 (Oct. 13, 2016). *See also* Compl. ¶ 59 (challenging independence of

14

the sale process and decision to approve the Merger calls for enhanced scrutiny under *Revlon* and its progeny.[25] But as our Supreme Court explained last year in *Corwin v. KKR*,[26] *Revlon* was "primarily designed to give stockholders and the Court of Chancery the tool of injunctive relief to address important M&A decisions in real time, before closing," and was not a tool "designed with post-closing money damages claims in mind."[27]

In the post-closing context, the Supreme Court held in *Corwin* that "when a transaction not subject to the entire fairness standard is approved by a fully informed, uncoerced vote of the disinterested stockholders, the business judgment rule applies."[28] This rule flows from our "long-standing policy . . . to avoid the

---

Campbell and Datillo for approving additional compensation for management during the sale process).

[25] *Revlon, Inc. v. MacAndrews & Forbes Hldgs., Inc.*, 506 A.2d 173, 182 (Del. 1986) ("[When] the break-up of the company [is] inevitable[,] . . . [t]he duty of the board . . . change[s] from the preservation of [the company] as a corporate entity to the maximization of the company's value at a sale for the stockholders' benefit.").

[26] 125 A.3d 304 (Del. 2015).

[27] *Id.* at 312.

[28] *Id.* at 308-09. After carefully reviewing the context of this statement, Vice Chancellor Slights concluded in *Larkin v. Shah* that the Supreme Court did not intend to suggest that every form of transaction that otherwise may be subject to entire fairness review was exempt from the potential cleansing effect of stockholder approval, but that "the only transactions that are subject to entire fairness that cannot be cleansed by proper stockholder approval are those involving a controlling stockholder." *Larkin v. Shah*, 2016 WL 4485447, at *10 (Del. Ch. Aug. 25, 2016); *see also In re KKR Fin. Hldgs. LLC S'holder Litig.*, 101 A.3d 980, 1003 (Del. Ch. 2014) ("even if the plaintiffs had pled facts from which it was reasonably inferable that a majority of . . . directors were not independent, the business judgment standard of review still would apply to the merger because it was

15

uncertainties and costs of judicial second-guessing when the disinterested stockholders have had the free and informed chance to decide on the economic merits of a transaction for themselves."[29]  More recently in *Singh v. Attenborough*, our Supreme Court further explained that:  "When the business judgment rule standard of review is invoked because of a vote, dismissal is typically the result. That is because the vestigial waste exception has long had little real-world relevance, because it has been understood that stockholders would be unlikely to approve a transaction that is wasteful."[30]

There is no dispute that a majority of Solera's disinterested stockholders approved the Merger in an uncoerced vote after receiving a definitive proxy statement dated October 30, 2015 (the "Proxy Statement").[31]  Plaintiff does not contend, furthermore, that the decision to approve the Merger was an act of waste. Thus, the threshold question that defendants' motion to dismiss presents, which would be decisive to the resolution of the present motion if answered in the affirmative, is whether the Solera's stockholders' approval of the Merger was fully-informed.  I turn to that question next.

---

approved by a majority of the shares held by disinterested stockholders . . . in a vote that was fully informed.").

[29] *Id.* at 313.

[30] *Singh v. Attenborough*, 137 A.3d 151, 151-52 (Del. 2016).

[31] Clark Aff. Ex. 2.

### 1. The Pleading Standard when the Cleansing Effect of a Stockholder Vote is Put at Issue

Before considering the merits of the specific disclosure issues in this case, I pause to address a question that was the point of some confusion in the parties' presentations—how does the burden of proof operate when applying the standard-shifting principles arising from a fully-informed, uncoerced vote of a majority of disinterested stockholders that the Supreme Court reaffirmed in *Corwin*?

In 1999, Chancellor Chandler explained in *Solomon v. Armstrong* that the party bearing the burden of proof on disclosure issues varies depending on whether the issue arises as an affirmative claim or as part of a ratification defense:

> In their analyses of Delaware's disclosure jurisprudence, there appears to be some dispute among the litigants over who bears the burden of proof on disclosure issues. The answer is that it depends on which type of disclosure claim is made by whom. As far as claims of material misstatements, omissions and coercion go, the law is clear that plaintiff bears the burden of proof that disclosure was inadequate, misleading, or coercive. On the other hand, when it comes to claiming the sufficiency of disclosure and the concomitant legal effect of shareholder ratification after full disclosure (*e.g.*, claim extinguishment, the retention of the business judgment rule presumptions, or the shift of the burden of proof of entire fairness from the defendant to the plaintiff) it is the defendant who bears the burden.[32]

Later that year, Chief Justice Strine, writing as a Vice Chancellor, agreed in the *Harbor Finance* case that, when a board seeks "to obtain 'ratification effect' from a

---

[32] *Solomon v. Armstrong*, 747 A.2d 1098, 1128 (Del. Ch. 1999) (internal citations omitted).

stockholder vote," the "burden to prove that the vote was fair, uncoerced, and fully informed falls squarely on the board."[33]

In deciding *Corwin* at the trial court level, I endorsed the same allocation of the burden of proof, holding that the burden to show the vote was fully-informed fell on the defendants asserting a "ratification" defense.[34] Although the Supreme Court did not address the issue directly on appeal, it appeared to agree with this allocation,[35] and later decisions of this Court have taken the same approach.[36] To state that defendants bear the burden to establish that a vote is fully informed,

---

[33] *Harbor Finance P'rs v. Huizenga*, 751 A.2d 879, 899 (Del. Ch. 1999).

[34] *KKR*, 101 A.3d at 999 ("Defendants, who have asserted this defense, bear the burden of establishing that the 2014 Proxy disclosed all material facts."). I use the term "ratification" here to refer broadly to any approval by a majority of disinterested stockholders pursuant to a fully informed, uncoerced vote that could lead to a shift in the standard of review under *Corwin*, regardless of whether the vote was voluntary or statutorily required. As I explained in *KKR* and the Supreme Court affirmed in *Corwin*, although there is precedent holding that the term "ratification" describes only a voluntary stockholder approval, the legal effect of a fully informed stockholder vote should be the same whether or not the vote was voluntary. *Id.* at 1002-03.

[35] *Corwin*, 125 A.3d at 312 n.27 (quoting with approval the discussion in *Harbor Finance* concerning the allocation of the burden of proof).

[36] *See, e.g.*, *In re Volcano Corp. S'holder Litig.*, 143 A.3d 727, 748 (Del. Ch. 2016) ("Although a plaintiff generally bears the burden of proving a material deficiency when asserting a duty of disclosure claim, a defendant bears the burden of demonstrating that the stockholders were fully informed when relying on stockholder approval to cleanse a challenged transaction."); *In re Comverge, Inc. S'holders Litig.*, C.A. No. 7368-VCMR, at ¶ 7 (Del. Ch. Oct. 31, 2016) (ORDER).

however, leaves open the question who has the *burden to plead* disclosure deficiencies in the first place to test whether the vote really was fully-informed.[37]

It makes little sense in my view that defendants must bear this pleading burden for it would create an unworkable standard, putting a litigant in the proverbially impossible position of proving a negative. Chief Justice Strine similarly recognized in *Harbor Finance* "the illogic of requiring the court and defendants to identify disclosure deficiencies not complained of by experienced plaintiffs' lawyers."[38] It instead is far more sensible that a plaintiff challenging the decision to approve a transaction must first identify a deficiency in the operative disclosure document, at which point the burden would fall to defendants to establish that the alleged deficiency fails as a matter of law in order to secure the cleansing effect of the vote.[39]

---

[37] "Burden of pleading" is "[a] party's duty to plead a matter in order for that matter to be heard in the lawsuit." *Burden of Pleading*, BLACK'S LAW DICTIONARY (10th ed. 2014). "Burden of proof," on the other hand, refers to "[a] party's duty to prove a disputed assertion or charge." *Burden of Proof*, BLACK'S LAW DICTIONARY (10th ed. 2014). *Cf. Monroe County Employees' Retire. Sys. v. Carlson*, 2010 WL 2376890, at *2 (Del. Ch. June 7, 2010) (holding that although defendants bear the burden to prove the transaction is entirely fair, plaintiff must make factual allegations in the complaint that demonstrate the absence of fairness); *Brader v. Allegheny Gen. Hosp.*, 64 F.3d 869, 876 (3d Cir. 1995) (holding that although the plaintiff satisfied his burden to plead an antitrust injury, the Court was making no determination as to whether the plaintiff would be able to satisfy his burden of proof in the post-pleading stage of litigation); 2 MCCORMICK ON EVID. § 337 (2016) ("The burdens of pleading and proof with regard to most facts have been and should be assigned to the plaintiff," but the burdens of proof "do not invariably follow the [burden of pleading].").

[38] *Harbor Finance P'rs*, 751 A.2d at 891 n.36.

[39] In this regard, the Court may properly consider relevant portions of a proxy statement when analyzing disclosure issues, not to establish the truth of the matters asserted, but to

The logic of this approach is borne out by the reality that this is how ratification defenses in corporate sale transactions have been litigated in practice since *Corwin* was decided, including in this case.[40]

Some have expressed concern about the fairness of requiring plaintiffs to plead disclosure deficiencies before obtaining discovery.[41] The reality, however, is that plaintiffs must plead claims before receiving discovery in American civil litigation all the time.[42] In the deal litigation context, moreover, plaintiffs may avail themselves of the relatively low pleading standard of "colorability" to obtain

---

examine what was disclosed to the stockholders. *In re Santa Fe Pacific Corp. S'holder Litig.*, 669 A.2d 59, 69 (Del. 1995) ("It was certainly proper to consult the Joint Proxy to analyze the disclosure claim because the operative facts relating to such a claim *perforce* depend upon the language of the Joint Proxy. Thus, the document is used not to establish the truth of the statements therein, but to examine only what is disclosed.").

[40] *See, e.g.*, *City of Miami Gen. Empls. v. Comstock*, 2016 WL 4464156, at *10-16 (Del. Ch. Aug. 24, 2016) (plaintiff alleged seven categories of disclosure deficiencies in the proxy); *Larkin*, 2016 WL 4485447, at *20 (holding that plaintiffs conceded the vote was fully informed by failing to brief their disclosure claims); *In re Om Gp., Inc. S'holders Litig.*, 2016 WL 5929951, at *12-17 (Del. Ch. Oct. 12, 2016) (plaintiffs seeking to avoid *Corwin* by arguing that the proxy was materially misleading in three specific respects); *Volcano*, 143 A.3d at 748-49 (plaintiffs arguing that the vote was not fully informed because of an alleged omission); *Comverge*, C.A. No. 7368-VCMR, at ¶ 6 (plaintiffs arguing that the stockholder vote was not fully informed by pointing to three alleged omissions in the company's disclosure); *Chester Cty. Ret. Sys. v. Collins*, C.A. No. 12072-VCL, at ¶ 10 (Del. Ch. Dec. 6, 2016) (ORDER) ("Because the plaintiff has not pled a viable disclosure claim, the business judgment rule applies.").

[41] Tr. Oral Arg. at 30:11-22; 52:8-14 (Oct. 13, 2016).

[42] The ability to conduct a books and records inspection under 8 *Del. C.* § 220 functionally serves as an important exception in non-expedited stockholder litigation, but there is no indication in the record that the plaintiff here availed itself of that opportunity.

discovery in aid of disclosure claims before a stockholder vote,[43] which is the preferred time to address such claims in order to afford remedial relief appropriate for genuine informational deficiencies.[44] Here, to the credit of the plaintiff who filed the first case in this consolidated action, that course of action was pursued but he simply came up short in trying to identify a colorable disclosure claim.

## B. The Stockholder Vote Approving the Merger was Fully Informed

Under Delaware law, when directors solicit stockholder action, they must "disclose fully and fairly all material information within the board's control."[45] The essential inquiry is whether the alleged omission or misrepresentation is material. Delaware has adopted the standard of materiality used under federal securities laws. Under that standard, information is "not material simply because [it] might be helpful."[46] Rather, it is material only "if there is a substantial likelihood that a

---

[43] *See Nguyen v. Barrett*, 2016 WL 5404095, at *3 (Del. Ch. Sept. 28, 2016) (comparing the legal standards for evaluating disclosure claims pre-closing and post-closing).

[44] *In re Transkaryotic Therapies, Inc.*, 954 A.2d 346, 360 (Del. Ch. 2008); *Comstock*, 2016 WL 4464156, at *9; *see also In re Staples, Inc. S'holders Litig.*, 792 A.2d 934, 960 (Del. Ch. 2001) (VC. Strine) ("Delaware case law recognizes that an after-the-fact damages case is not a precise or efficient method by which to remedy disclosure deficiencies. A post-hoc evaluation will necessarily require the court to speculate about the effect that certain deficiencies may have had on a stockholder vote and to award some less-than-scientifically quantified amount of money damages to rectify any perceived harm. . . . An injunctive remedy . . . specifically vindicates the stockholder right . . . to receive fair disclosure of the material facts necessary to cast a fully informed vote—in a manner that later monetary damages cannot and is therefore the preferred remedy, where practicable.").

[45] *Stroud v. Grace*, 606 A.2d 75, 84 (Del. 1992).

[46] *Skeen v. Jo-Ann Stores, Inc.*, 750 A.2d 1170, 1174 (Del. 2000).

21

reasonable shareholder would consider it important in deciding how to vote."[47]  In other words, information is material if, from the perspective of a reasonable stockholder, there is a substantial likelihood that it "significantly alter[s] the 'total mix' of information made available."[48]

Although the materiality standard has been ingrained into the fabric of Delaware law for decades, plaintiff seizes on the Supreme Court's use of the phrase "troubling facts" in *Corwin* to insinuate that defendants were obligated to disclose "all troubling facts regarding director behavior" irrespective of their materiality.[49]  I disagree.  The relevant sentence from *Corwin* makes clear that the Supreme Court did not establish a new standard for stockholder disclosure, but simply confirmed, consistent with existing precedent, that "troubling facts regarding director behavior . . . *that would have been material to a voting stockholder*" must be disclosed when seeking stockholder approval of a transaction.[50]

In its Complaint, plaintiff asserted six categories of disclosure deficiencies,[51] a number of which I found not to be colorable in denying the motion for expedition

---

[47] *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 944 (Del. 1985) (adopting materiality standard of *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)).

[48] *Arnold v. Soc'y for Sav. Bancorp*, 650 A.2d 1270, 1277 (Del. 1994).

[49] *See* Pl.'s Ans. Br. 7.

[50] *Corwin*, 125 A.3d at 312.

[51] Those categories consisted of (1) omissions regarding the alleged conflicts of the Special Committee, which plaintiff presses on this motion; (2) omissions regarding the alleged "specific benefits obtained by Aquila and Company management from Vista, including all

22

in the *Braunstein* action, and only one of which plaintiff addressed in its opposition brief. The alleged disclosure deficiencies listed in the Complaint that plaintiff did not brief have been abandoned and are deemed waived.[52] Plaintiff also asserted in its brief a new disclosure challenge that was absent from the Complaint. After considering the only two disclosure allegations that plaintiff briefed, I conclude that both are without merit as a matter of law and thus defendants have established that the stockholder vote was fully informed.

### 1. Disclosures Concerning the Alleged Conflicts of the Special Committee

Plaintiff asserts that the Proxy Statement "omitted sufficient disclosures regarding the conflicts of the Special Committee, including the role of the Special Committee members in the Compensation Committee actions, especially with respect to the approval of the Retention Award and the Special Cash Award."[53] The only alleged conflict of the Special Committee plaintiff has identified is the fact that

---

[52] amounts received under the Merger-related compensation arrangements and any rollover and investment opportunities from Vista;" (3) omissions regarding the alleged "actual and potential conflicts of Centerview and Rothschild Inc.," a financial advisor to Solera; (4) the alleged failure to disclose whether Party B was subject to a standstill; (5) alleged omissions and misrepresentations concerning Centerview's fairness analyses; and (6) alleged omissions and misrepresentations concerning Solera's financial projections. Compl. ¶¶ 138-41, 143-47.

[52] *Emerald P'rs v. Berlin*, 2003 WL 21003437, at *43 (Del. Ch. Apr. 28, 2003) ("It is settled Delaware law that a party waives an argument by not including it in its brief."), *aff'd*, 840 A.2d 641 (Del. 2003) (TABLE).

[53] Compl. ¶ 138.

two members of the Special Committee also served on the Compensation Committee.[54] I conclude that this information was disclosed adequately to Solera's stockholders, and that the identity of the Compensation Committee members was not material to the stockholder vote on the Merger in any event.

The Proxy Statement contained the following disclosure regarding the identity of the Special Committee members: "[T]he board of directors formed the special committee, consisting of three independent and disinterested directors, to oversee a review of the Company's strategic alternatives: Stuart J. Yarbrough (as chairman), Patrick D. Campbell and Thomas A. Dattilo."[55] The Proxy Statement also expressly incorporated by reference a Form 10-K/A filed just two days earlier.[56] The Form 10-K/A disclosed that the report on executive compensation recited therein had been prepared by the members of the Compensation Committee and then listed them by name as follows: Thomas A. Dattilo, Pat Campbell, and Thomas C. Wajnert.[57]

Under Delaware law, documents incorporated by reference into a disclosure statement may be considered disclosed. In *Orman v. Cullman*, for example, the

---

[54] *See* Pl.'s Ans. Br. 7-10.

[55] Clark Aff. Ex. 2 (Proxy Statement) at 33.

[56] Clark Aff. Ex. 2 (Proxy Statement) at 110 ("We incorporate by reference the documents listed below . . . ." The first one listed is the "Annual Report on Form 10-K for the fiscal year ended June 30, 2015 (filed with the SEC on August 31, 2015), as amended on October 28, 2015.").

[57] Clark Aff. Ex. 3 (Form 10-K/A) at 18.

Court dismissed a disclosure claim because the facts concerning the relevant director's alleged self-interest were "sufficiently disclosed" in the Form 10–K and Form 10–K/A that were incorporated into the proxy statement by reference.[58] Similarly here, by expressly incorporating by reference a Form 10-K/A issued just two days earlier, the Proxy Statement provided sufficient disclosure to Solera's stockholders regarding the identity of all of the members of both the Special Committee and the Compensation Committee before they were asked to vote to approve the Merger. The Proxy Statement thus did inform them about "the role of the Special Committee members in the Compensation Committee actions."[59]

Despite the fact that the Proxy Statement and the Form 10-K/A incorporated therein listed by name the members of both the Special Committee and the Compensation Committee, plaintiff asserts that the following statement in the Proxy Statement created a false impression that the individuals involved in the sale process were not simultaneously deciding compensation issues:

> Also on August 13, 2015, the special committee determined, in light of the corporate governance considerations associated with the adoption of any management retention plan, that the evaluation of such a management retention plan should be conducted through the compensation committee of the board of directors.[60]

---

[58] *Orman v. Cullman*, 794 A.2d 5, 34-35 (Del. Ch. 2002); *see also In re W. Nat'l Corp. S'holders Litig.*, 2000 WL 710192, at *28 (Del. Ch. May 22, 2000) (finding that proxy statement adequately disclosed litigation risk by incorporating SEC filings).

[59] Compl. ¶ 138.

[60] Clark Aff. Ex. 2 (Proxy Statement) at 36.

Even if a reasonable person might infer from this paragraph *alone* that the memberships of the Special Committee and the Compensation Committee did not overlap, that inference would not be material in my view for two reasons. First, because the Proxy Statement and the Form 10-K/A incorporated therein fully disclosed the composition of both committees, this paragraph does not "significantly alter the 'total mix' of information made available."[61] Second, given that the Merger was approved unanimously by all eight members of Solera's board, seven of whom were outside directors whose independence and disinterestedness is not meaningfully challenged,[62] the fact that two members of the Special Committee also served on the Compensation Committee was immaterial in my view.

### 2. Disclosures Concerning the "Purpose and Effect" of Certain Payments to Management

Plaintiff argues that the Proxy Statement failed to disclose certain information bearing on the "purpose and effect" of (a) the payments made under the Retention Plan to Aquila and other members of management and (b) the Special Cash Award to Aquila, both of which were approved in August 2015, a few weeks before the Board approved the Merger.

---

[61] *Arnold*, 650 A.2d at 1277.

[62] *See supra* note 24.

I note at the outset that plaintiff's central grievance with these payments appears to focus more on their propriety than whether the material facts concerning them were fully disclosed to Solera's stockholders when they were asked to approve the Merger. Plaintiff argues, for example, that the board's approval of payments conditioned on the sale of the Company "disincentivized management to wait and pursue the more valuable option of running the Company long-term" and "increased the incentive to sell."[63] Even if true, these criticisms bear on the substantive merits of the decision Solera's outside directors made to award the compensation at issue. Insofar as disclosures to the stockholders are concerned, plaintiff takes issue with several aspects of the Proxy Statement, but fails to identify any material omission of fact, or any false or misleading statement contained therein.

First, plaintiff argues that the Proxy Statement falsely stated that $33 million in payments under the Retention Plan where intended "'to preserve the value of the Company' and to 'contribute towards the successful ongoing operations of the Company's business'" because $24 million of these payments "were payable only if management *completed* a merger."[64] Cropped from plaintiff's quotation of the Proxy Statement, however, is additional language that made clear that the payments under the Retention Plan were intended to serve a dual purpose, which included

---

[63] Pl.'s Ans. Br. 12-13.

[64] *Id.* at 11 (quoting Proxy Statement).

27

incentivizing management to continue their employment until the "completion of any strategic transaction involving the Company:"

> On August 23, 2015, the compensation committee of the board of directors held a meeting. At the meeting, the compensation committee of the board of directors reviewed and approved the terms of a proposed retention and transaction success program with an aggregate payment amount of $33 million for certain members of Company management and key employees, which was designed to preserve the value of the Company and ***to provide an additional incentive for certain members of Company management and key employees to continue in employment and contribute towards*** the successful ongoing operations of the Company's business and ***the completion of any strategic transaction involving the Company***.[65]

The Proxy Statement also itemized the specific amounts of the "retention awards" that Aquila, Giger, and Brady would receive "only if the merger is consummated" with the qualification that "50% of Mr. Aquila's award is payable on the earlier of the consummation of the merger and August 22, 2016."[66] In short, the actual disclosure in the Proxy Statement concerning the directors' reasons for approving the Retention Plan and the details of its operation undermine plaintiff's characterization of these disclosures as "false."

Second, citing to the Form 10-K/A issued on October 28, 2015, plaintiff argues that the Proxy Statement did not disclose "that before the $24 million was granted, the Company's compensation structure focused on incentivizing

---

[65] Clark Aff. Ex. 2 (Proxy Statement) at 37 (emphasis added).

[66] Clark Aff. Ex. 2 (Proxy Statement) at 69-70.

28

management to grow the business for the long-term benefit of shareholders."[67]  As noted above, however, the Proxy Statement expressly incorporated by reference the Form 10-K/A cited by plaintiff, which explains the vesting features of the Mission 2020 option awards, and the fact that none of them would trigger a payment in connection with the Merger because the option price exceeded the Merger price:

> In March 2013, we granted the Mission 2020 Awards to the NEOs.  The Mission 2020 Awards are highly performance-contingent, multi-year non-qualified stock options for our NEOs as an economic incentive to obtain for the Company and our stockholders each NEO's long-term commitment and continued substantial efforts and contributions to both increased profitability and stockholder value creation during the first phase of Mission 2020.  Seventy percent of the Mission 2020 Awards are earned and vest only upon achievement of performance-based milestones (the "Performance-Based Awards").  Thirty percent of the Mission 2020 Awards vest on a time-based schedule (the "Time-Based Awards").
>
> As of June 30, 2015, none of the Performance-Based Awards have been earned, and one-third of the Time-Based Awards have vested.  Upon the closing of the [Merger], all of the Mission 2020 Awards will be canceled, and the NEOs will not receive any Merger consideration in connection with the Mission 2020 Awards as the exercise price per share ($58.33) exceeds the per share Merger consideration of $55.85.[68]

Third, plaintiff quibbles about the alleged failure to disclose the reasons behind a supposed shift in Solera's compensation strategy.  But as the above

---

[67] Pl.'s Ans. Br. 12.

[68] Clark Aff. Ex. 3 (Form 10-K/A) at 13-14.  The abbreviation "NEO" refers to the Company's "named executive officers," which were Aquila, Giger, and Brady during fiscal year 2015.  *Id.* at 6.

discussion reflects, the compensation plans were fully disclosed, and "asking why does not state a meritorious disclosure claim" under Delaware law.[69]

Finally, plaintiff asserts that the Proxy Statement's disclosure regarding the $10 million Special Cash Award to Aquila was misleading. The relevant disclosure reads as follows:

> On August 25, 2015, the compensation committee of the board of directors approved a one-time, special cash award to Mr. Aquila in the amount of $10 million, which amount the Company paid to Mr. Aquila on August 27, 2015. The special cash award recognizes Mr. Aquila's contributions during fiscal year 2015 (including achievements commenced in fiscal year 2015 and completed in fiscal year 2016 year to date) above and beyond Mr. Aquila's actual achievements measured against his individual performance objectives set forth in the Company's fiscal year 2015 annual business incentive plan. The special cash award did not relate in any way to the Company's exploration of strategic alternatives, including the merger. The Company publicly announced the approval and payment of the special cash award to Mr. Aquila on August 31, 2015.[70]

According to plaintiff, this disclosure was misleading because it "suggested that [Aquila] had not already been compensated for his performance under the current incentive plans."[71] More specifically, plaintiff contends that certain of the achievements the Compensation Committee identified in determining the multiplier to apply to establish Aquila's compensation under a different bonus plan (the

---

[69] *In re Sauer-Danfoss Inc. S'holders Litig.*, 65 A.3d 1116, 1131 (Del. Ch. Apr. 29, 2011).

[70] Clark Aff. Ex. 2 (Proxy Statement) at 38.

[71] Pl.'s Ans. Br. 14.

"Annual Business Incentive Plan" or "ABIP") for fiscal year 2015 are similar to those that were used for the Special Cash Award.[72]

Plaintiff's contentions concerning the Special Cash Award once again appear to reflect more a disagreement with the merits of the compensation decision than a genuine disclosure claim. Plaintiff does not dispute that the Proxy Statement disclosed the amount, nature, and timing of the Special Cash Award. Not only do I discern no disclosure deficiency regarding the Special Cash Award, the details concerning this payment were immaterial in my view to the stockholders in deciding whether to approve the Merger. As I observed early in this case when denying the prior plaintiff's motion for expedition, the Special Cash Award, which the Company paid out on August 27, 2015, logically had no impact on who the company was sold to because it had been paid and the money was out the door before final bids were submitted and the Merger Agreement was signed.[73]

* * * * *

For the reasons explained above, plaintiff's disclosure challenges are without merit and defendants thus have sustained their burden to establish that the stockholder vote approving the Merger was fully informed.

---

[72] *Id.* at 14-15 (comparing factors considered in making ABIP payment for fiscal year 2015, as listed in the October 28, 2015 Form 10-K/A, with factors considered in granting the $10 million Special Cash Award, as listed in the August 31, 2015 Form 8-K).

[73] *Braunstein v. Aquila*, C.A. No. 11524-CB, Transcript at 56:9-12.

**C.    The Business Judgment Rule Applies to the Board's Approval of the Merger**

Because the Merger was approved by a majority of Solera's disinterested stockholders in a fully informed, uncoerced vote, the business judgment rule—and not enhanced scrutiny as plaintiff advocates—applies to the Solera board's decision to approve the Merger, and the transaction may only be attacked on the ground of waste. Since plaintiff does not assert that the board's decision to approve the Merger amounted to waste, the Complaint must be dismissed for failure to state a claim for relief.

## III.    CONCLUSION

For the foregoing reasons, defendants' motion to dismiss the Complaint with prejudice is GRANTED.

**IT IS SO ORDERED**.